UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN J. COX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Cause No. 1:22-cv-1279-JMS-MJD |
| FCA US, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S AMENDED RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Sandra L. Blevins
Courtney E. Endwright
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana  46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail:    sblevins@betzadvocates.com
               cendwright@betzadvocates.com
               litigation@betzadvocates.com

*Attorneys for Plaintiff Steven J. Cox*

**Exhibit
A**

## I.    __INTRODUCTION__.

Steven Cox served FCA US, LLC for nearly three decades before the events leading to this lawsuit occurred, and FCA had no record of any discipline against Cox for the previous 15 years. Cox had worked for years to reach his position in the metallurgical lab at FCA—described as a lifetime position given the generous overtime hours and less strenuous labor afforded by this position. However, in 2018, Cox suddenly faced multiple allegations of threatening and intimidating behavior, most of which were unsupported by actual witnesses. Roy Carroll warned Cox that he had a target on his back after Cox opposed the discriminatory behavior against him, stating, "People BEEN wanting you gone," and further stated, "When are you gonna learn! Lots of people up here are used to blacks who comply and (understand) how it is!" [Dkt. 70-15 at Cox-502-504].

Caucasian employees made most of these allegations. The main complainant—Jerry Andreas—asserted Cox made a threat that three other employees in the room never heard. Andreas and his friends continued lodging complaints against Cox, which were accepted as true without question and held against Cox by his supervisors Anthony Freda and Jared Smith—even when such claims were demonstrably false. Conversely, Cox repeatedly complained about Andreas's calling Cox the "n-word" and referring to Cox as "boy" on countless occasions, without any penalty to Andreas—even when another employee told FCA he heard Andreas use the term "boy."

FCA additionally subjected Cox to a targeting campaign that included a Caucasian supervisor lying about what he heard during an argument, false complaints about Cox, and Andreas's spreading false perceptions of Cox that were adopted by his supervisors and even Labor Relations employees. Cox was deemed untrustworthy by FCA even when allegations against him were suspicious or farfetched. FCA ultimately terminated Cox's employment after false allegations of sleeping and forced him to return under a Hobson's choice of accepting a last chance agreement that would allow

FCA to terminate Cox for any future policy violation or moving from his lifetime appointment to a different department entirely with less pay.

Because a reasonable jury could find Cox was harassed and discriminated and retaliated against, all because of race, the Court should deny Defendant's Motion for Summary Judgment in its entirety.

## II. <u>FACTUAL BACKGROUND</u>[1]

### A. Cox has loyally served FCA for more than three decades, and FCA had not disciplined Cox for the 15 years preceding the events at issue in this matter.

Cox began working for FCA in June 1989, and he has been employed at FCA for over 3 decades. [Dkt.70-1 at FCA_910; Dkt.71-9 at 7 (Cox Dep.23:22-23:25)]. Cox is a "damn good worker," and when needed, has worked 20 hours straight to avoid plant shutdowns. [Dkt.69-31 at FCA_843; Dkt.71-12 (Freda Dep.109:16-109:24); Dkt.69-29 at FCA_1640]. Between 2003 and 2018, FCA has no record of any discipline against Cox. *See* Dkt.69-17.

On June 13, 2016, Cox transferred to the metallurgical lab ("met lab") to serve as a chemical technician—a highly coveted position (also called a "lifetime" appointment). [Dkt.71-10 (Kucholick Dep.36:3-36:13); Dkt.70-1 at FCA_906]. This position provided significant amounts of overtime in a "seven-day operation department" with less strenuous labor than other positions at FCA. [Dkt.71-9 at 8 (Cox Dep.26:19-27:11, 267:25-268:15); Dkt.74-1¶¶2-4]. At first, Anthony Freda (Caucasian), chief metallurgist, served as Cox's direct supervisor. [Dkt.71-9 at 9 (Cox Dep.29:5-29:15); Dkt.74-1¶32(f); Dkt.71-12 (Freda Dep.15:2-16:13]. Freda made statements to Cox such as, "I think black people should get jobs and take care of themselves" and would refer to black people as "your people" to Cox. [Dkt.71-9 at 27 (Cox Dep.106:4-108:17)].

---

[1] For the Court's convenience and reference, a timeline of relevant events is attached as Exhibit 103 and the identity and job title of FCA employees identified in Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment are listed in Exhibit 104.

In September 2018, Jared Smith (Caucasian)—at 24 years old—began directly supervising Cox as the met lab supervisor. [Dkt.71-11 (Smith Dep.8:14-16, 9:6-9:16, 47:22-48:5); Dkt.74-1¶32(g)]. From approximately September 2018 through June 2021, Smith supervised the metallurgical technicians, who were Salary Bargaining Unit ("SBU"), and the chemical technicians, like Cox, who were Hourly Bargaining Unit ("HBU"). [Dkt.71-11 (Smith Dep.8:14-16, 9:6-9:16, 47:22-48:5); Dkt.71-12 (Freda Dep.20:5-20:10)]. Freda supervised Smith during this time. [Dkt. 71-12 (Freda Dep.20:5-20:25)].

In FCA's Labor Relations ("LR"), Stacy Chasteen, Joseph Martino, and Kasey Sanders (all Caucasian) shared responsibility for overseeing HBU employees. [Dkt.71-13 (Sanders Dep.18:21-19:10, 22:13-23:24, 80:17-80:19, 168:10-168:19); Dkt.74-1¶32]. Josh Kucholick, HR Manager, and Martin Biggar, Engineering Supervisor (both Caucasian), oversaw the SBU employees. [Dkt.71-13 (Sanders Dep.38:22-38:24, 168:16-168:19); Dkt.71-12 (Freda Dep.17:18-18:17); Dkt. 71-10 (Kucholick Dep.18:7-19:5, 39:10-39:21); Dkt.74-1¶32].

## B.  By 2018, Cox began experiencing derogatory treatment from another met lab employee, Jerry Andreas.

By 2018, Cox began encountering issues with a Caucasian metallurgical technician, Jerry Andreas, when Andreas used "racial slurs" with Cox. [Dkt.71-9 at 18, 20 (Cox Dep.71:15-71:16, 78:17-79:17)]. Cox reported Andreas's behavior to his representative at the United Auto Workers Local 685 ("Union") and to Freda. *Id.* at 20-22, 24 (Cox Dep.79:18-81:1, 82:1-82:8, 84:15-86:3, 93:9-94:15)]. Union officials "work[ed] together" with management when members brought issues to the Union's attention. *Id.* at 12 (Cox Dep.42:21-43:5). Andreas, however, "constantly" addressed Cox "as his boy," in "a particular tone" and "way" even after Cox "told him over and over what that word meant to [Cox]" and "a lot of other people." *Id.* at 23-24 (Cox Dep.92:19-95:4). Andreas never used the term "boy" with other employees. *Id.* at 24 (Cox Dep.93:4-93:8). Andreas also told Cox about his distaste of NFL players' who kneeled during the national anthem to protest racial injustice (they

needed to "shut the f**k up" and "play football")[2] and for Obama, who "never" should have been "president." *Id.* at 24-25 (Cox Dep.95:18-98:12).

## C.  In August 2018, FCA failed to discipline Andreas who was confirmed as saying "BOY, you need to come to work, do your job and don't say nothing…shut your mouth."

On July 22, 2018, Cox became involved in a verbal dispute with Andreas, during which a witness confirmed that Andreas stated, "BOY, you need to come to work, do your job and don't say nothing . . . shut your mouth." [Dkt.74-6 at FCA_796; Dkt.71-9 at 23 (Cox Dep.90:2-91:18)]. Andreas claimed that Cox mentioned to Andreas "handl[ing]" an argument "two ways – keep it in the family or keep it quiet – handle it like we do at the Foundry – take it outside and fight it out like men. Go to the river and duke it out." [Dkt.74-5 at FCA_793]. Cox believed that Andreas led Cox into making a joke about "knocking the fat off" another employee, which Cox had joked about before, that was then reported to LR. [Dkt.71-9 at 29 (Cox Dep.114:6-116:2)].[3]

Cox reported Andreas's comments during a meeting with Stacy Chasteen on August 2, 2018 as part of Chasteen's investigation of the verbal dispute between Cox and Andreas (as well as a few other complaints against Cox that had arisen around this situation). [*Id.* at 22 (Cox Dep.86:8-87:25); Dkt.70-2 at FCA_827-30]. Cox further reported to Chasteen that Roy Carroll (African American), told Cox that other FCA employees, including Andreas and another met lab employee, Nelson Carlson (Caucasian), "want[ed] Steve gone" and to "watch his back." [Dkt.74-11 at FCA_861-63; Dkt.70-2 at FCA_834; Dkt.71-9 at 18, 28-29 (Cox Dep.71:17-71:18, 112:9-13:17)].

During her investigation, Chasteen found three employees in the area at the time of the dispute who never heard Cox's alleged "foundry" comment. [Dkt.74-7 at FCA_802; Dkt.74-8; Dkt.74-9].

---

[2]  It is common knowledge that NFL players protested racial injustice by kneeling during the national anthem. *E.g.,* Vanessa Romo, NPR, *NFL On Kneeling Players' Protests: 'We Were Wrong,' Commissioner Says* (Jun. 5, 2020), https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/05/871290906/nfl-on-kneeling-players-protests-we-were-wrong-commissioner-says.

[3]  FCA claims "Cox told Andreas that his 'money' was on HBU Met Lab employee Ronnie Davis . . . ." [Dkt.56 at 5]. Cox actually testified remembering **Andreas** "telling [Cox] that his money was on Ronnie Davis in a fight." [Dkt. 71-9 (Cox. Dep.114:6-114:18).

Carroll, who had worked with Cox for two decades and had spent significant time training with him, never witnessed Cox threatening anyone. [Dkt.74-11 at FCA_861-63; Dkt.74-1¶36)]. Though Freda told Chasteen he heard Cox make this "foundry" comment, Chasteen later discovered Freda had only "heard" "some yelling, screaming" from his office that was "50 feet away."[ Dkt.71-12 (Freda Dep.103:16-104:14); Dkt.69-32; Dkt.69-33 at FCA_856]. When Cox mentioned wanting to return to the foundry ways in 2020, this meant, "why can't things be handled the same way [FCA] used to at the foundry years ago" when "foundry issues had been handled, investigated and resolved by the individual departments," instead of LR? [Dkt.70-12 at FCA_1310-11].

Chasteen further discovered that although other FCA employees, including Andreas, accused Cox of "[y]ell[ing] at" Freda, Freda disagreed, stating Cox did not "necessarily yell at him, but he does get loud." [Dkt.69-31 at FCA_842]. Cox's "voice goes up" in "the heat of the moment," and he "gets excitable;" and, as "everyone's voice may have inflection back and forth," but Freda did "not consider someone getting a little loud" as yelling. [Dkt.71-12 (Freda. Dep.108:15-109:15)]. Freda never examined whether other employees' allegations of Cox's yelling at Freda were based on his naturally loud voice. *Id.* (Freda. Dep.149:3-149:14). Freda also contradicted Andreas's account of the July 2018 dispute with Cox by confirming shortly after the dispute, Andreas, Cox, Freda, and another employee were "sitting around the room talking about the strike," "laughing and having fun." [*Id.* Freda Dep.110:19-11:2); Dkt.74-5 at FCA_791; Dkt.69-31 at FCA_843].

FCA imposed a discipline level step 3 to Cox for allegedly "threatening others," based on Cox's "knocking the fat off" comment he thought was a joke, rather than the "foundry" comment alleged by Andreas. [Dkt.70-3 at FCA_788].Chasteen instructed Freda to discipline Andreas based on the July 22, 2018 argument since Andreas violated FCA's rules, but Freda refused to do so although Andreas's yelling at Cox "should" have been a basis for disciplining Andreas. [Dkt.69-30; Dkt.71-12 (Freda Dep.103:16-104:18, 111:11-111:20)]. FCA did not discipline Freda for this failure to discipline

Andreas. *See id.*(Freda Dep.22:6-22:11). FCA never investigated Andreas's statements any further; Chasteen simply instructed Andreas "not to refer to any employee as 'Boy.'" [Dkt.74-5 at FCA_791]. The usual discipline for an FCA employee using a racial slur such as the n-word goes from suspension of "one week to termination," "depending on the discipline record and on the situation in the case." [Dkt. 71-10 (Kucholick Dep.68:12-68:20)].

**D. Andreas's antagonism continued into 2019, and even after Andreas was found to have filed a complaint with LR in retaliation for Cox's own discrimination complaint, FCA continued crediting only Andreas's version of events.**

Andreas continued antagonizing Cox and even "muffled" the n-word at Cox, but Cox was afraid to report this incident because of the ongoing campaign against him and the lack of FCA's investigation into Andreas's conduct. [Dkt.71-9 at 37 (Cox Dep.146:10-47:24)]. Andreas continued using "boy" to reference Cox. [Dkt.69-34 at FCA_1606]. Cox pleaded for help from Freda with Andreas, but Freda refused to help Cox. [Dkt.71-9 at 37 (Cox Dep.146:10-48:22)].

On February 2, 2019, Cox again reported Andreas's use of the word "boy," which Andreas admitting using, but Freda only told Andreas his using the word "boy" "could be perceived" as a racial slur. [Dkt.69-34 at FCA_1606]. Cox also reported Andreas's adding unnecessary work for Cox on weekends. [Dkt.71-9 at 33-34 (Cox Dep.130:5-34:22)]. On February 6, 2019, Andreas indicated an intent to move shifts, and Ronnie Davis, Johnson, and Freda told Cox that FCA "advised" Andreas "to move" shifts. [Dkt.70-18 at FCA_1185-86; Dkt.71-9 at 34 (Cox Dep.134:23-36:1)]. When issues persisted with Andreas, Cox met with Lawrence Wilson, FCA's Diversity Lead in Kokomo, on April 3, 2019, who conducted interviews with Cox, Andreas, Freda, and Smith. [Dkt.70-21 at FCA_1168-74]. On May 1, 2019, Wilson's final report found Cox's claims were unsupported because "there were no witnesses." [Dkt.70-22 at FCA_105]. On July 12, 2019, FCA required verbal counseling against Andreas for using "5x" to describe Cox but left the other findings unchanged. [Dkt.70-5 at FCA_99; Dkt.70-19; Dkt.70-20].

On May 22, 2019, Andreas filed a complaint against Cox that asserted Cox showed him a knife 2 years earlier. [Dkt.74-16 at FCA_785-86; Dkt.70-23 at FCA_1687; Dkt.70-24 at FCA_1690]. This complaint was dismissed as retaliation against Cox on June 19, 2019. [Dkt.70-23at FCA_1688]. A final determination letter was provided to Cox on August 12, 2019. [Dkt.70-25].

Even though Andreas's complaint was dismissed as retaliation, Andreas kept telling other FCA employees, including Biggar and Smith, that FCA disciplined Cox in 2018 for threatening Andreas with a knife. [Dkt.70-17; Dkt.69-4 at FCA_277; Dkt.71-1 at FCA_617]. Andreas told Smith that Cox "had presented a knife to him," but when Smith examined Cox's disciplinary history, he learned of a 2018 discipline that did not include a reference to a knife. [Dkt.71-11 (Smith Dep.8:14-8:16, 9:6-9:16, 47:22-48:5)]. Smith was "skeptical of the context" of Andreas's report and knew Cox's 2018 discipline did not involve a knife after reviewing Cox's disciplinary history, yet Smith stated on September 14, 2020 that "[r]umor has it that this incident [in 2018] concerned a weapon (knife)." [Dkt.69-27 at FCA_1767; Dkt.71-11 (Smith Dep.47:22-48:11)]. Smith then submitted an ethics complaint on September 16, 2020 admitting Cox never "threatened" Smith, but FCA disciplined Cox in 2018 after "a report of threatening with a knife." [Dkt.69-4 at FCA_277]. Biggar similarly was told Cox had "two counts of threatening and intimidation on his record," "[o]ne in 2018 for threatening [Andreas] with a knife." [Dkt.70-17].

On April 14, 2019, Cox complained Freda failed to help him with his issues with Andreas and allowed Andreas to continue to overload him with work assignments, harass him, and talk about him behind his back to coworkers including Andreas continuing to refer to Cox as "boy". [Dkt. 70-4].

**E. Shortly after making his complaints against Andreas in August 2018, Cox was called numerous times to defend himself against unwarranted accusations against him by Smith and Freda.**

Cox was forced to report to the labor office between 10 and 12 times between August 2018 and August 2020 to defend himself against additional unwarranted accusations, including for multiple,

false disciplinary issues brought forth by Smith, each of which Cox contested. [Dkt.74-1¶¶8-9]. Then, on July 31, 2019—days after the disposition of Cox's complaint against Andreas at FCA's corporate level, Smith disciplined Cox for refusing to follow a supervisor's instructions although Smith never gave a direct order to Cox. [Dkt.71-9 at 39 (Cox Dep.155:8-56:16); Dkt.69-17]. "[T]ypically," a "manager will tell the hourly employee that they are giving a direct order" before FCA disciplines him for failing to follow a supervisor's instructions. [Dkt.71-14 (Martino Dep.159:25-60:18)]. FCA later told Cox's Union this discipline had been removed from his file, but it remained in his file. [Dkt. 69-17; Dkt.71-9 at 40 (Cox Dep.157:13-157:23, 159:13-60:3)].

After this July 31, 2019 discipline, Cox sought a transfer from first to third shift to avoid Smith, but Smith continued pursuing Cox. [*Id.* at 18 (Cox Dep.70:3-70:11); Dkt.71-2]. On October 14, 2019, Smith attempted to discipline Steve over an additional conflict with Andreas. [Dkt.69-35 at FCA_1536]. Smith believed Andreas specifically took the action at issue "because he thought it might aggravate Steve." [Dkt.71-11 (Smith Dep.56:5-58:14)]. Smith admitted speaking to Cox "unprofessional[ly]" about this issue. [Dkt.71-1 at FCA_621]. Smith reported to FCA that others had issues with Cox, but when asked the identities of those individuals, Smith claimed they "would rather remain anonymous." [Dkt.69-35 at FCA_622]. The "others" Smith referenced was actually only one person. [Dkt.71-11 (Smith Dep.117:5-18:2)]. No discipline was ultimately issued against Cox. *See* Dkt.69-17.

After these issues continued, on June 19, 2020, Cox again requested a meeting with labor, the civil rights rep, and the Union. [Dkt.71-8]. On July 17, 2020, Cox contacted Martin Biggar to request a meeting to discuss "some problems/issues he was having." [Dkt.70-12 at FCA_1309]. On July 22, 2020, Cox met with Biggar for 25 minutes to report "several points of concern," including that "his civil rights had been violated." *Id.* Cox never "use[d] any 'shop floor language' or bec[a]me aggressive in nature." *Id.* at FCA_1311. On July 31, 2020, Biggar forwarded an email containing his notes from

8

this conversation to Martino. [Dkt.70-12 at FCA_1309]. Biggar and Martino met on July 31, 2020 at 10:00 am about this issue. *Id.*

**F.  In August of 2020 and in violation of FCA's practices, FCA terminated Cox's employment before ever speaking with him.**

On August 25, 2020, Cox's car was towed without a warning, which is the usual policy for FCA's parking lot. [Dkt.71-9 at 45, 47 (Cox Dep.179:3-179:5, 187:3-187:16)]. Cox usually parked in the back of the parking lot to avoid damage to his car. *Id.* at 44 (Cox Dep.175:24-76:8). Members of the security team previously cleared Cox's use of his typical parking spot. *Id.* (Cox Dep.175:22-76:23). When Cox asked security why his car was towed, a security team member called Cox a "f***ing stupid little boy" who should have known where he was permitted to park, and Cox told security "not to touch his f***ing car again." *Id.* at 45 (Cox Dep.179:19-80:12). Only Cox's car was towed that night, and only one other car was towed throughout the entire month; all others received tickets. *See* Dkt.70-10. Photographs from this night show countless empty spots around Cox's car, and other photographs show how frequently similar parking lot violations occurred. [Dkt.71-9 at 44 (Cox Dep.175:24-76:8); Dkt.70-11 at FCA_3762-66; Dkt.70-8].

After Cox picked up, paid for his car, and tipped the employee who assisted him, Cox called Misfits Towing & Recovery ("Misfits") to ask whether Misfits towed any other FCA employees' cars that night, but Misfits employee Kaitlyn Deis refused to answer Cox, leading to a verbal argument. [Dkt.71-9 at 46-47 (Cox Dep.184:17-86:4); Dkt. 69-39]. Cox told Ms. Deis, "Don't touch my f***ing car again." *Id.* at 46 (Cox Dep.182:25-83:13). Cox then called back to apologize to Ms. Deis. *Id.* Ms. Deis "didn't feel like [Cox] really meant that he was going to do anything" and "just knew that he was probably upset." [Dkt.71-15 (K. Deis Dep.14:17-15:9)]. Ms. Deis, however, called the Kokomo police "to file a report to make sure that if something like this ever did come up, that [Misfits] would have a report number." *Id.* (K. Deis Dep.14:3-15:9). The investigating police officer refused to pursue anything against Cox given the lack of actual threats by Cox, and the police report was closed out

within 37 minutes of its submission, as a "low" priority and concluding: "threat **not** in progress." [Dkt.69-40 (emphasis added); Dkt.71-9 at 46 (Cox Dep.183:21-183:25)].

Martino—the FCA employee assigned to investigate this situation "hadn't started" an investigation because "it just wasn't a priority for him." [Dkt.71-13 (Sanders Dep.46:11-46:25)]. FCA expected LR employees to conduct an investigation and interview all parties "before discipline is issued." [Dkt.71-10 (Kucholick Dep.46:2-46:7, 50:25-51:3)]. Instead, Martino spoke with someone from security and terminated Cox's employment in—at most—30 minutes. [Dkt.69-24 at FCA_1789; Dkt.71-14 (Martino Dep.133:22-37:9); Dkt.69-2; Dkt.71-5].

Martino testified he had never terminated an employee before an investigation occurred and did not recall ever terminating an employee on the same day as an alleged incident. [Dkt.71-14 (Martino Dep.58:17-59:1)]. In explaining the situation to Kucholick, Martino stated that Cox "[p]arked his new corvert [sic] like an a\*\*hole across 3 spots, it was towed" and "mother f\*\*\*ed the entire security staff then got to misfits [sic] and threatened to shoot everyone involved." [*Id.* (Martino Dep.139:12-139:21); Dkt.69-25 at FCA_1770]. Martino confirmed Cox's termination, stating, "HE GONE!" *Id.* at FCA_1770; Dkt.71-14 (Martino Dep.143:6-145:11)]. Kucholick responded, "Yeah…BYE BYE!" [*Id.* (Martino Dep.143:6-45:11); Dkt.69-25 at FCA_1770; Dkt.71-10 (Kucholick Dep.124:18-26:21)]. Martino and Kucholick claimed these emails were not celebratory and instead showed how serious Cox's situation was. [*Id.* (Kucholick Dep.124:18-126:21); Dkt.71-14 (Martino Dep.143:6-45:11)]. Sanders only coached Martino on "speak[ing] appropriately and professionally" in his email to Kucholick. [*Id.* (Martino Dep.50:14-51:1, 137:18-39:24)].

## G.  After weeks off work, FCA allowed Cox to return to work.

During Sanders's investigation of this situation, she examined Cox's disciplinary history that included "at least one other incident in which aggression was alleged." [Dkt.71-13 (Sanders Dep.53:21-54:18)]. Sanders relied on Martino's word about there being a "history" with Cox and a

past of Cox not "tak[ing] responsibility for his actions." *Id* (Sanders Dep.145:14-46:13)]. Sanders pressured Cox to admit to statements he did not make to Misfits, but Cox refused. [Dkt.70-6; Dkt.70-7; Dkt.71-9 (Cox Dep at 191:13-191:23, 200:15-202:5)]. During the grievance process, FCA brought Cox back to work after FCA determined Cox did not present an "immediate threat" to FCA, and Cox made no threatening statements to security. [Dkt. 71-13 (Sanders Dep.51:22-51:25); Dkt.69-4 at FCA_278-79]. Furthermore, Misfits was a third party, and that alleged incident occurred off company property and off company time. *Id.* at FCA_278-79. FCA required Cox to attend counseling sessions, which he completed. [Dkt.71-9 (Cox Dep.127:8-127:12)]. Sanders did not investigate Cox's complaint that security had called him a "f**king stupid little boy" although security admitted using the word "stupid" during the conversation. [*Id.* (Cox Dep.180:1-180:9); Dkt. 71-13 (Sanders Dep.149:22-50:20)]. Cox reported to Sanders that Smith was "target[ing]" Cox and "harassing" Cox; thus Sanders agreed to "mediate any future issues between Smith and Cox." *Id.* (Sanders Dep.147:8-48:21).

## H. FCA closely monitored Cox on his return—looking for any mistakes.

Cox learned that during Sanders's investigation she was "going around the whole plant canvassing, soliciting negative statements from people that interact with [Cox] at work to find a legitimate reason to keep [him] out." [Dkt.71-9 at 43-44 (Cox Dep.172:16-73:15)]. This included investigating an argument between Dwayne Hendricks and Cox during which Hendricks called Cox the n-word. *Id.* at 43 (Cox Dep.170:14-71:21). Sanders determined both individuals had yelled at each other, so no discipline was necessary but never dealt with Hendricks calling Cox the n-word since Cox had no "proof" the incident occurred. *Id.* at 44 (Cox Dep.173:23-75:18)].

When Cox returned to work, Sanders told Cox she would fire him for any other alleged violation of FCA policy or complaint by a coworker, irrespective of its veracity or who was at fault. *Id.* at 50-51 (Cox Dep.200:15-202:5). When Cox arrived at work on his first day back, he discovered that his

badge was still inactive, and he had to return home. *Id.* at 49 (Cox Dep.195:4-195:16); Dkt. 71-13 (Sanders Dep.67:9-67:13); Dkt.69-5 at FCA_695]. On his second day back at work, Cox's badge still had not been reactivated. [Dkt.71-9 at 49 (Cox Dep.195:17-195:20, 196:4-196:11); Dkt. 71-13 (Sanders Dep.67:14-68:19)]. Although Cox had been on time that day and only technically clocked in late because of the inactive badge, Sanders attempted to terminate his employment. [*Id.* (Sanders Dep.70:19-72:17, 73:9-73:17); Dkt.69-5 at FCA_695; Dkt.71-9 at 49-50 (Cox Dep.196:18-197:3)]. Nonetheless, during a meeting between Cox, his Union representative, and Sanders, Sanders acknowledged the attempted termination was an error on her part. [Dkt.69-5 at FCA_695-96]. A Union official, Dave Johnson, confirmed that Sanders was "[a] little harassing and intimidating" towards Cox and "got on his a** pretty good" when investigating this matter. [Dkt.69-7 at FCA_600]. Specifically, Sanders told Cox, "I told you you'd be in deep s**t if back up in Labor." *Id.* She "got in his a** before she knew what happened, but was apologetic and professional after hearing his side." *Id.* Sanders and Smith continued to closely monitor Cox at work and continued to make multiple inaccurate accusations of wrongdoing against Cox approximately 2 to 3 times a month over the next several months. [Dkt.74-1¶10].

On December 9, 2020, Smith attempted to discipline Cox over issues with a coworker, Tony Hawkins. [Dkt.69-8 at FCA_607]. In February 2021, Smith claimed Hawkins told Smith that he feared Cox, but this same employee told Sanders that this allegation was false. [Dkt.69-11 at FCA_606; Dkt.69-26]. Hawkins told Sanders he had no issues with Cox and said he "never told Jared [Smith] that Steve [Cox] was harassing him." [Dkt.69-11 at FCA_606]. Hawkins believed Smith "should have admitted [Smith] did something wrong but he didn't." [Dkt.69-11 at FCA_606]. Sanders subsequently noted she "perceived negative bias toward Cox" by Freda and Smith and reported this bias to their supervisor, Martin Biggar. [Dkt.69-9 at FCA_898; Dkt.69-10 at FCA_732]. Biggar never spoke with Freda about Sanders's "bias" concerns. [Dkt.71-12 (Freda Dep.56:15-57:2)].

Smith does not recall any conversation with Biggar about a negative bias towards Cox. [Dkt.71-11 (Smith Dep.93:6-93:15)]. Sanders also noted that the "union does feel that Smith [sic] something against Cox." [Dkt.69-13 at FCA_727].

On March 8, 2021, Smith accused Cox of threatening him by Cox's pointing a finger at Smith, while Cox was "7 or 8 feet away" from Smith as Cox was walking towards the door; and Smith accused Cox of calling Smith a "liar." [Dkt.69-12 at FCA_729, Dkt.69-13 at FCA_726; Dkt.71-9 at 65 (Cox Dep.277:7-277:17)]. Smith "was essentially calling Cox a liar," and Cox responded by calling Smith a "liar" and told Smith (who was 24 years old) that he had "a lot to learn." [*Id.* at 53-54 (Cox Dep.211:12-14:10); (Dkt.71-11 (Smith Dep.8:14-8:16); Dkt. 71-13 (Sanders Dep.82:22-83:17)]. Another employee in the meeting told Sanders "she would understand why Mr. Cox got upset," and Cox later returned to finish the meeting without issue. *Id.* (Sanders Dep.82:22-83:17, 171:13-72:5)]. No discipline was issued against Cox. [Dkt.69-23].

**I. In April 2021, Smith tried to fire Cox over alleged sleeping. Despite numerous credibility issues, Sanders upheld this discipline until the grievance process reinstated Cox.**

In mid-April 2021, Smith attempted to get Cox fired again by putting Cox on notice for sleeping on the job. [Dkt.69-19 at FCA_1211]. Smith allegedly obtained a photo of Cox sleeping but refused to divulge the identity of the employee who had taken the photo. [Dkt.71-13 (Sanders Dep.85:11-86:8)]. Sanders, who was investigating this allegation, could not obtain access to the original digital photograph and the original metadata for this photograph. *Id.* Sanders Dep.85:19-87:16). The photograph with Cox's legs on the ground did not match Smith's description of Cox with his feet on the desk. [Dkt.69-14; Dkt.69-23 at FCA_758]. Furthermore, the photo in question had a Christmas tree in it, although it was supposedly taken in April of 2021. [Dkt.69-14]. Cox was also wearing athletic shoes rather than work boots that he wears while he is working. [Dkt.69-14]. Cox would have been subject to additional discipline if he was not wearing his work boots since he worked with chemicals, and he did not change into his athletic shoes until he had completed all of his assigned

13

work for the day. [Dkt.74-1¶¶12-13)]. Moreover, during the timeframe Smith accused Cox of sleeping, at least one other employee confirmed that Cox was attending a meeting with two other employees. [Dkt.74-14; Dkt.69-37]. Sanders never talked to these individuals or gathered an original digital photograph of Cox with the original metadata. [Dkt.69-37; Dkt.71-13 (Sanders Dep.85:19-90:21)]. Sanders concluded Cox had been sleeping because "[t]he photo said a lot." *Id.* (Sanders Dep.89:23-90:3).

On May 4, 2021, Sanders informed Cox that he was being terminated for sleeping on the job. [Dkt.69-20].FCA, however, did not terminate any other production technician in Cox's department for allegations of sleeping after September 1, 2018. [Dkt.74-20]. Although sleeping during breaks is still purportedly a policy violation, whether an employee was on a break when caught sleeping "would be a factor" in determining discipline in addition to the "[s]everity" of the sleeping incident and "past discipline history." [Dkt. 71-10 (Kucholick Dep.83:22-84:6)].

Cox also observed and took photographs of other Caucasian employees who were not disciplined by FCA for sleeping on the job, including Andreas. [Dkt.74-1¶22; Dkt.71-12 (Freda Dep.31:15-31:17); Dkt.74-1¶¶21-22]. Cox personally witnessed multiple Caucasian employees who were caught asleep by FCA supervisors—such as Andreas—but were never put on notice or disciplined for sleeping. [Dkt.74-1¶¶23-26; Dkt.71-9 at 48-49 (Cox Dep.244:21-47:17, 249:7-50:24)]. Supervisors who catch "hourly or salary employes were supposed to "wake the employee up safely, put them on notice," although some managers "ask somebody to come over and be a witness." [Dkt.71-10 (Kucholick Dep.53:3-54:3, 55:4-55:8)]. Photographs of employees sleeping are not used to discipline employees. *Id.* (Kucholick Dep.54:4-54:15).

**J.  After another grievance was filed, FCA allowed Cox to return but only if he signed a last chance agreement or moved departments.**

After FCA terminated Cox for sleeping, the Union filed another grievance on Cox's behalf, including allegations of discrimination based on Cox's race and retaliation. [Dkt.69-28]. On April 21,

2021, Cox also filed an ethics report against Sanders. [Dkt.74-12 at FCA_1117-20]. In June 2021, weeks after Cox was put on notice, Cox was told that he could return to the same job if he signed a last-chance letter that would permit FCA to fire him for any violation of FCA policy. [Dkt.74-1¶¶18-19]. Otherwise, Cox could choose to move departments away from a 7-day operation department. [Dkt.74-1¶19]. To avoid certain termination under a last-chance letter, Cox felt forced to move departments. [Dkt.74-1¶19; Dkt.69-22; Dkt.71-9 at 57-58 (Cox Dep.238:11-42:13)]. This caused a significant decrease in Cox's overall compensation since his new department was not a 7-day operation department. [Dkt.74-1¶19]. Sanders admitted that she forgot to change Cox's discipline from step 6 to step 3 as required by this agreement to return Cox to work, leaving Cox's disciplinary history vulnerable to misinterpretation or manipulation. [Dkt.69-17; Dkt.71-13 (Sanders Dep. at 194:11:194:16)].

In exchange for dropping his grievance, on June 3, 2021, Cox signed a document that stated: "[Cox] agree[d] that all grievances, charges, claims, and/or complaints that were filed or that could have been filed that concern [Cox's] termination are resolved." [Dkt.69-22]. Per the Union, when Cox "signed his conditional reinstatement the understanding was that it released the company from all matters related to the grievance . . . for his discharge." [Dkt.70-13]. Sanders believed the agreement "resolved the grievance filed by Mr. Cox." [Dkt.71-13 (Sanders Dep.193:18-94:22)]. FCA never addressed or mentioned a waiver of all legal claims against FCA, and only Cox's grievance was resolved, not his Title VII claims. [Dkt.74-1¶17]. Cox did not have legal counsel, and he does not have a college or other advanced degree. [*Id.*; Dkt.71-9  (Cox Dep.14:23-17:6)].

Since Cox changed departments in June 2021, FCA has not disciplined Cox, and the Union has not needed to file any grievances on Cox's behalf. [Dkt.71-9 at 62 (Cox Dep.257:20-58:12); Dkt.74-1¶28]. Eventually, given the relentless pursuit of Cox, Cox felt forced to change plants altogether on September 13, 2021. [Dkt. 70-14; Dkt.70-1 at FCA_906; Dkt.71-9 at 62 (Cox Dep.257:20-58:7)].

**K.  Other African American employees warned Cox he was being targeted.**

On August 25, 2020, Carroll stated, "[y]ou know they got your # waiting to drop it." [Dkt.70-15 at Cox-499-500]. On September 10, 2020, when Cox stated, "Man u got to watch ur [sic] back around there [sic] trust no one," Carroll responded, "Who you telling! I been warning you for too long for this conversation," and "People BEEN wanting you gone." [Dkt.70-15 at Cox-502-504]. Carroll also stated, "When are you gonna learn! Lots of people up here are used to blacks who comply and (understand) how it is!" [Dkt.70-15 at Cox-502-504].

Hawkins also sent Cox a copy of an email chain dated May 5, 2021 to FCA employee, Shannon Moore, stating, "I would like to set up a meeting with the plant manager to discuss the problems and cultural differences that we are having in department 4380 metallurgical lab." [Dkt.70-16 at Cox-509-10]. Nonetheless, FCA never provided this email chain during discovery. [Dkt. 74-2¶4]. On June 12, 2021, in response to Cox's statement, "[T]hey are thinking I cause all of this noise when n [sic] fact Jared created this whole situations [sic] and used you to get it through [sic] cold blooded," Hawkins responded, "That's what I was saying [sic] what did Rick Ward tell you [sic] this didn't have nothing to do with me [sic] Drew or the safety meeting [sic] Jared and Kasey the one [sic] that hates you [sic] they Just [sic] needed a reason." [Dkt.70-16 at Cox-517].

**L.  Numerous complaints against Cox were exaggerated, while for others, Cox was found to be justified.**

In January 2017, Cox was accused of saying "f*** you" to PJ Rocchio (Caucasian). [Dkt.74-17; Dkt.74-1¶32(o)]. Nonetheless, Rick Ward—another FCA employee—said Rocchio was "difficult to deal with," and he "never heard" Cox use the "'F' bomb ever." [Dkt.74-3]. Carroll confirmed Cox never said "f*** you" to Rocchio. [Dkt.74-4]. No discipline resulted. *See* Dkt.69-17.

In October 2017, Garnet Cripe (Caucasian), accused Cox of sexual harassment. *See* Dkt.71-7. Freda said he "didn't consider it to be that big of an issue," and Cripe told him "it didn't' bother her

that much," and no discipline resulted from these accusations. [Dkt.71-12 (Freda Dep.59:5-59:21)].

*See* Dkt.69-18.

In January 2018, Lanthony Knight (Caucasian) accused Cox of confronting him angrily after Knight failed to provide coverage for Cox as promised. [Dkt.71-9 at 15-16 (Cox Dep.57:3-63:13)]. Cox confronted Knight about not doing his job and sleeping several hours at the time while on the job, and Knight poked Cox in the chest, leading to Cox telling Knight, "Don't you ever f**king ever do that again." *Id.* Knight had been sleeping for several hours at a time while on the job and had been disciplined for attendance issues. [Dkt.71-4; Dkt.71-11 (Smith Dep.33:7-33:9)]. FCA caught Freda altering Knight's timecard to show he was on time to work. [Dkt.71-3 at FCA_870; Dkt.69-31 at FCA_842]. FCA did not discipline Cox. [Dkt.69-17].

Around July 13, 2020, Cox had a disagreement with Teddy Evans. [Dkt.69-3 at FCA_549]. Cox was disappointed that Evans refused to stay over, which meant—based on past experience—that Cox needed to come in on his day off or face serious trouble. [Dkt.71-9 at 9 (Cox Dep.32:5-32:21, 73:2-73:20, 165:3-69:1)]. Cox's complaints were found to be justified, and no discipline was issued. [Dkt.69-17; Dkt.71-12 (Freda Dep.37:11-37:19)]]. Nonetheless, Martino and Smith used this allegation as a means to solicit additional reasons to discipline Cox. [Dkt.71-6 at FCA_1446-49].

### III.    MATERIAL FACTS IN DISPUTE.

Certain material facts are disputed in the record as follows:

1. **Disputed Fact Nos. 1-3:** FCA claims Andreas merely said, "Boy, you need to come to work, do your job, and don't say nothing." [Dkt.56 at 6]. Ronnie Gold confirmed Andreas actually said, "BOY, you need to come to work, do your job and don't say nothing . . . **shut your mouth**." [Dkt.74-6 at FCA_796] (emphasis added). FCA also implies Cox's report concerning Andreas's calling Cox "boy" was uncorroborated, yet Gold confirmed hearing this statement, and FCA simply told Andreas not to do it again. [Dkt.74-6 at FCA_796; Dkt.74-5 at FCA_791]. Cox also testified that Andreas used the term "boy" "constant[ly]" although Cox explained "over and over again" how hurtful that word was because of Cox's race. [Dkt.71-9 at 23-24 (Cox Dep.92:19-93:8, 94:20-94:4)]. The word "boy" was not used only "two to three times" as asserted by FCA. [Dkt.56 at 31].

2. **Disputed Fact No. 4:** FCA claims Cox believed that Andreas did not like that he was not Cox's boss and "'had it out' for Cox, including [only] because he did not do things Andreas wanted

him to do that he believed were immature, such as 'messing with'" another employee. FCA omitted Cox's testimony that added multiple other issues, including "if you didn't do what he asked you to do," "he had a problem with that" as well as "when it came to the auto-fills," "[Andreas] didn't like" that "workload;" "[w]hen he tried to piece me certain jobs to do, when I went to my union and addressed it, . . . [h]e retaliate[d] against me for all of that;" "I was told by" Davis that Carlson and Andreas "had a complex towards black men because both their daughters had had a relationship with black men." [Dkt.71-9 at 33 (Cox Dep.131:9-131:15, 132:8-33:6)].

3. **Disputed Fact No.5:** FCA alleges "Andreas stated he believed Cox was retaliating against him for participating in the July 2018 complaint against Cox," and "FCA was unable to confirm a policy violation." [Dkt.56 at 7]. FCA omitted its own finding Andreas filed this complaint against Cox in "retaliation" for Cox's April 2019 complaint against Andreas. [Dkt.70-23 at FCA_1688].

4. **Disputed Fact No. 6:** FCA asserts "Cox was not disciplined for his statements to his supervisor" in 2019 [Dkt.56 at 8], but Cox's discipline for this incident still appears on his record. [Dkt.69-17]. While Cox thought no discipline resulted from this issue, "when [he] got the discovery" for this matter, Cox "saw this still on [his] record." [Dkt.71-9 at 40 (Cox Dep.159:13-60:3)]. Past discipline impacts an employee's future level of punishment for at least 12 months (and beyond) if FCA administers future discipline. [Dkt.71-13 (Sanders Dep.53:21-55:13)].

5. **Disputed Fact No. 7:** FCA inferred that Tony Hawkins had a complaint against Cox, but Hawkins declined to file a formal complaint against Cox based on a "'code of conduct' between bargaining unit employees," prohibiting "a complaint about another union brother or sister." [Dkt.56 at 12]. Hawkins, however, strongly disputed Smith's narrative about him and Cox. [Dkt.69-11 at FCA_606]. Hawkins denied he lost any sleep because of Cox and blamed Smith for his stress at work. *Id.*

6. **Disputed Fact Nos. 8-10:** Cox disputes it was "reasonable" to conclude he was sleeping during the April 2021 incident. [Dkt.56 at 14]. At least one other witness confirmed Cox was awake during the time in question, and Cox identified numerous other suspicious circumstances surrounding the incident. *See supra* Section II.I (noting, e.g., a Christmas tree was in the background and contradicting circumstances). Who took the photo provided to Sanders is disputed. Smith claimed he took a photo and gave it to Sanders. [Dkt.56 at 14]. Sanders's testimony contradicts this assertion. [Dkt.71-13 (Sanders Dep.85:11-86:8)]. Finally, although FCA claims "Smith had received other complaints of Cox sleeping on the job" [Dkt.56 at 14], Smith could only recall one such report, and no documentation exists on that alleged report, though Smith said he emailed HR about it. [Dkt.71-11 (Smith Dep.71:12-72:12)]. Freda similarly claimed "several" issues existed but then admitted there were only two total issues brought to his attention. [Dkt.71-12 (Freda Dep.28:23-29:7)].

7. **Disputed Fact No. 11:** FCA claims Cox signed a "last chance agreement" in June 2021 [Dkt.56 at 1, 15-16], but Cox signed an agreement requiring FCA to drop its progressive discipline to step 3, not step 5, in exchange for Cox's transferring departments instead of signing a last chance agreement that would have allowed him to stay in the same position. [Dkt.71-9 at 57 (Cox Dep.238:11-42:4)].

8. **Disputed Fact No. 12:** FCA claims Cox was "irritated" at Teddy Evans merely because "Evans owed Cox money" [Dkt.56 at 9], which was only partially true. Cox "didn't like the fact that [Cox] had to come [in] from [his] off day" because Evans refused to cover for Cox. [Dkt.71-9 at 42-43 (Cox Dep.165:3-69:1)]. Cox was also "a little irritated with Teddy Evans at the time because he owed [Cox] money," and Cox believed Evans had been taking items from his locker. *Id.*

9. **Disputed Fact No. 13:** Sanders denied that Cox reported that Dwayne Hendricks called him the n-word during their argument. *See* Dkt.71-13 (Sanders Dep.149:1-149:21). Cox specifically recalls reporting this incident to Sanders, who concluded the incident did not occur because Cox had no "proof" of the slur. [Dkt.71-9 at 44 (Cox Dep.173:23-75:18)].

10. **Disputed Fact No. 14:** Sanders noted she "perceived negative bias toward Cox" by Freda and Smith and reported this bias to their supervisor, Biggar. [Dkt.69-10 at FCA_732]. However, Sanders later denied "perceiv[ing] any bias" by Smith against Cox. [Dkt.71-13 (Sanders Dep.91:24-92:16, 165:14-165:22)].

11. **Disputed Fact No. 15:** During a February 2021 issue between Smith and Cox, Smith claimed Cox's finger was "approximately six (6) inches from Smith's face," [Dkt.56 at 13], but Cox actually stood "7 or 8 feet away" from Smith while he was walking towards the door to the meeting room. [Dkt.69-12 at FCA_731; Dkt.71-9 at 65 (Cox Dep.277:7-277:17)].

12. **Disputed Fact No. 16:** In 2018, Freda contradicted himself on Cox's argument with Andreas. Freda told Chasteen he heard Cox's alleged comment about "handl[ing] it like we do at the foundry," but Chasteen later discovered Freda admittedly had not heard the conversation between Andreas and Cox. [Dkt.69-32; Dkt.69-33 at FCA_856]. Freda heard "some yelling, screaming," from his office 50 feet away, but "that was all." [Dkt.71-12 (Freda Dep.103:16-104:14)]. Freda later said he **did** hear "the very tail end of [Cox's statement] since [he] was in [his] office." *Id.* (Freda Dep.113:12-14:11). When he heard this "tail end" of Cox's alleged comment at 50 feet away, a "metallurgical saw" was running. *Id.* (Freda Dep.103:16-104:14); Dkt.74-10].

13. **Disputed Fact No. 17:** Cox admitted telling Ms. Deis, "Don't touch my f***ing car again." [Dkt.71-9 at 46 (Cox Dep.182:1-83:13)]. However, Cox disputes Misfits's changing assertions about Cox's statements, which are dubious, not only because there are factual inaccuracies but also because Cox's purported statements keep changing. In August 2020, Ms. Deis told Sanders that Cox said, "if you ever fucking touch my vehicle again, I will come back and fuck you up." [Dkt.69-5 at FCA_693]. Ms. Deis "never said anything about a gun or a weapon" to Sanders when they spoke. [Dkt.71-13 (Sanders Dep.127:22-127:24)]. Mr. and Ms. Deis now assert that Cox stated: "[H]e was going to come up to our office and start shooting and 'hopefully killing us all, one by one and I will start with you'. 'I don't care about you sorry stupid ass crackers, you all should die' was his next line . . ." [Dkt.69-38]. Mr. and Ms. Deis additionally asserted Cox said he would "not pay a dime" to pick up his car when Cox had already picked up and paid for his car even according to Ms. Deis's August 2020 statements to Sanders. *Compare* Dkt.69-5 at FCA_693 *with* Dkt.69-38 Cox's phone records confirm Cox was in Tipton, Indiana when his first call to Ms. Deis occurred at 8:14 am, and he continued south to Brownsburg, Indiana by 9:36 am, and he did not return to Kokomo that day. [Dkt.70-9 at Cox-844-46; Dkt.74-1¶¶29-31]. Mr. Deis has also claimed Cox called Ms. Deis and Mr. Deis "white honkies and trash" and claimed he said, "I'll show all you sons of bitches." [Dkt.71-16 (M. Deis Dep.32:3-32:13)]. Notably, Mr. Deis owns Confederate flag memorabilia, and Mr. and Ms. Deis do not believe the Civil War was about slavery. [Dkt.71-16 (M. Deis Dep.29:20-30:20); Dkt.71-15 (K. Deis Dep.28:22-29:10)].

14. **Disputed Fact No. 18:** FCA failed to attach the errata sheets and signature page for Kasey Sanders, but Cox disputes every single change made by Sanders because it contradicts her deposition testimony. Sanders's justifications for these changes are requested because she purportedly "[r]ecalled correct information," and she requests to "strike" numerous lines of testimony for "irrelevant"

information. [Dkt.71-13 at 39-40]. The Court should disregard each of these changes given these changes to these facts are made in FCA's favor rather than Cox's, contrary to the summary judgment standard.

<h3 style="text-align:center">IV.    <u>LEGAL ARGUMENT</u>.</h3>

**A.  Cox never knowingly or voluntarily released his legal claims under Title VII.**

Cox did not waive any of his legal claims by signing an agreement to resolve his grievance in June 2021 because Cox neither knowingly nor voluntarily waived his discrimination claims. Looking at the "totality of the circumstances," FCA cannot show "as a matter of law" that Cox knowingly or voluntarily forfeited his legal claims against FCA under Title VII. *Hindia v. Sheriff of Cook Cty.*, No. 18 C 06780, 2019 U.S. Dist. LEXIS 167673, at *14 (N.D. Ill. Sep. 30, 2019).

Cox had no legal counsel when the June 2021 agreement was executed, which weighs against waiver. [Dkt.74-1¶17]. *Hindia*, No. 18 C 06780, 2019 U.S. Dist. LEXIS 167673, at *15. Moreover, Cox's grievance process followed the applicable collective bargaining agreement ("CBA"), which states that "[t]he grievance and arbitration procedure shall be the exclusive **contractual procedure** for remedying such claims." [Dkt.69-16 at FCA_933-34] (emphasis added). The CBA clearly shows that the grievance process only resolves contractual issues, not Title VII claims. Moreover, the agreement failed to define or further clarify the meaning of the terms "charges," "claims," or "complaints." *See* Dkt.69-22. Given these ambiguous terms, this agreement cannot constitute a "knowing" or "voluntary" waiver of Cox's Title VII claims.

Further, the Union understood that "when Steve Cox signed his conditional reinstatement the understanding was that it released the company from all matters related to the grievance . . . for his discharge." [Dkt.70-13]. Even Sanders was under the impression that the agreement "resolved the grievance." [Dkt.71-13 (Sanders Dep.193:18-94:22)]. Cox was told that he was only resolving his grievance. [Dkt.74-1¶17]. Indeed, no one mentioned the release of Cox's legal claims during the meeting discussing the terms of this agreement. *Id.* If Cox, the Union, and Sanders (FCA's own

representative) were all unaware Cox was waiving his legal claims under Title VII, certainly there could be no "knowing" or "voluntary" waiver of Cox's Title VII claims.

FCA's reliance on *Mundy* is unavailing because unlike Cox's agreement, the agreement in *Mundy* "contained a provision whereby Ms. Mundy waived her right to 'appeal or grieve any of this discipline any further **in any forum**.'" *Mundy v. City of Pittsburgh*, No. 2:22-cv-31, 2022 U.S. Dist. LEXIS 102530, at *4-5 (W.D. Pa. June 8, 2022) (emphasis added). Cox only "agree[d] that all grievances, charges, claims, and/or complaints that were filed or that could have been filed that concern [his] termination are resolved." [Dkt.69-22]. No other forums were mentioned. *Id.*

Cox did not knowingly or voluntarily waive his right to pursue his Title VII claims, and the Court should reject FCA's argument that, as a matter of law, Cox waived his Title VII claims.

**B.  A reasonable jury could find that Cox was harassed because of his African American race in violation of Title VII.**

To "successfully pursue a hostile work environment claim," Cox must show a reasonable jury could find "(1) he was subjected to unwelcome harassment; (2) because of his race . . . ; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (4) there is a basis for employer liability." *Jenkins v. Cummins, Inc.*, No. 1:10-cv-313-TWP-DKL, 2012 U.S. Dist. LEXIS 40667, at *20 (S.D. Ind. Mar. 26, 2012).

**1.  Cox's harassment claims are not "limited" as asserted by FCA because they are all connected.**

Although FCA claims Cox's harassment claim is "limited" because the events in his lawsuit do not create a "single unlawful practice" [Dkt.56 at 23-25], this ignores that all of the harassment against Cox starting in July 2018 was connected to FCA's eventual termination of Cox's employment for sleeping in April 2021. Cox is alleging a hostile work environment created by the conduct of his coworkers, including Andreas, and his supervisors, including Freda, Smith, and Sanders, and Freda's and Smith's harassment of Cox continued from August 2018 through June 2021. Moreover, since

Cox claims "he is suffering a hostile work environment based on the conduct of coworkers and supervisors, then under the Supreme Court's totality of circumstances approach, all instances of harassment by all parties are relevant to proving that his environment is sufficiently severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1044-45 (7th Cir. 2000) (citing *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2283 (1998)).

### 2. Cox was subjected to unwelcome harassment based on his race.

From approximately July 2018 through his transfer to a new department in June 2021, Freda and Smith subjected Cox to demeaning and demoralizing treatment, including but not limited to by closely surveilling him and pursuing unwarranted disciplinary action against Cox on countless occasions between July 2018 and June 2021. *See supra* Sections II.E through II.H. For instance, Freda fully supported Andreas and not Cox, including by telling inconsistent stories about what happened between Cox and Andreas in July 2018; ignoring Cox's complaints about Andreas's use of the word "boy;" failing to discipline Andreas for yelling at Cox despite an order from Chasteen to do so; taking the word of Andreas and Smith over Cox's; and failing to help Cox when he pleaded for help with Andreas and Smith. *E.g.*, Dkt.71-9 at 37 (Cox Dep.146:10-48:22); Dkt.69-34 at FCA_1606; Dkt.69-30 at FCA_849; Dkt.71-12 (Freda Dep.103:16-104:18, 111:11-111:20, 149:3-149:14). Freda made negative comments about African Americans to Cox, such as, "I think black people should get jobs and take care of themselves," and on occasion referenced African Americans as "your people" to Cox. *Id.* (Freda Dep.108:9-108:17). Smith also persistently pursued Cox on false bases—including an alleged dispute with Hawkins and the allegation of sleeping. [Dkt.69-8 at FCA_607; Dkt.69-11 at FCA_606; Dkt.69-26].

Beginning in August 2020, Sanders immediately tried to force Cox to make admissions about the towing issue; constantly threatened Cox's employment; frequently searched for excuses to terminate his employment; and even canvassed FCA between September 2020 and June 2021 for reasons to

terminate Cox. *E.g.*, Dkt.71-9 at 43-44, 49-50 (Cox Dep.172:16-75:18, 196:18-97:3, 200:15-202:5); Dkt.69-7 at FCA_600; Dkt.69-5 at FCA_695-96; Dkt.71-13 (Sanders Dep.70:19-72:17, 73:9-73:17).

Andreas, for his part, "constant[ly]" referenced Cox as "boy" and even called him the n-word. [Dkt.71-9 at 23-24 (Cox Dep.92:15-95:4)]. Clearly referencing Cox as an n-word is racially motivated (albeit Cox did not immediately report it but then pleaded with Freda for help with Andreas). *Id.* at 37 (Cox Dep.146:10-48:22). However, FCA asserts Andreas's use of the word "boy" somehow was not "race-based" because Andreas had "coupled the term 'boy' with '5X' on one occasion, relating to [Cox's] size." [Dkt.56 at 32]. Nonetheless, Freda admitted that the use of the word "boy" carries racial undertones. [Dkt.69-34 at FCA_1606]. Cox repeatedly told Andreas and Freda that Andreas's use of the word "boy" was hurtful and racially discriminatory, but Andreas continued to use it and Freda continued to ignore it. [Dkt.71-9 at 23-24 (Cox Dep.92:19-93:8)]. Per the Seventh Circuit, the term "boy" is a word that can be "derogatory" towards African Americans "when used alone." *See Booker v. Johnsonville*, LLC, 713 F. App'x 506, 507 (7th Cir. 2018).

Furthermore, Cox felt targeted for harassment because he was African American, and Carroll confirmed, "People BEEN wanting you gone . . . When are you gonna learn! Lots of people up here are used to blacks who comply and (understand) how it is!" [Dkt.70-15 at Cox-502-504]. Hawkins tried to address the hostile environment with FCA management in May 2021, but FCA ignored him. [Dkt. 70-16 at Cox-509-10].

This pattern ultimately led to Cox's termination for alleged sleeping in May 2021 and forced Cox to move departments as well as move plants by September 2021. [Dkt.69-20; Dkt.69-21; Dkt.69-22;Dkt.70-14; Dkt.70-1 at FCA_906; Dkt.71-9 at 62 (Cox Dep.257:20-58:7)].

### 3. FCA's harassment of Cox was severe and/or pervasive and affected the conditions of Cox's employment.

"The conduct must be so severe or pervasive as to alter the conditions of employment such that there is an abusive working environment." *Harris v. FedEx Freight, Inc.*, 110 F. Supp. 3d 805, 814

(N.D. Ill. 2015). To qualify as severe or pervasive, "the environment must be 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Smith*, 388 F.3d at 566. Courts "examine 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . ; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 566.

Unquestionably, Cox found his work environment subjectively severe or pervasive to the point of altering his work conditions. He complained on several occasions about the harassment and hostile work environment that he was facing. *E.g.*, Dkt.74-5 at FCA_791; Dkt.70-2 at FCA_827-30; Dkt.69-34 at FCA_1606; Dkt.71-9 at 20-22, 24 (Cox Dep.79:18-81:1, 84:15-86:3, 93:9-94:15).

FCA disputes that the environment was "objectively offensive" because it mischaracterizes the facts by arguing that "Cox's complaints consist of isolated events that were not physically threatening or humiliating—despite his own threats of physical violence against others—and in some cases were not even directed at Cox," and "Andreas' allegation [sic] use of the term 'boy' in some combination two to three times is not objectively offensive." [Dkt.56 at 31]. FCA's cites Cox's supposed "threats of physical violence against others" as a reason Cox's environment was not objectively offensive [Dkt.56 at 31], yet Cox disputes that such threats of physical violence were made. Andreas's claims against Cox were furthermore part of a campaign to get rid of him. Thus, this was simply an attempt to distract the Court and discredit Cox. FCA, however, ignores the totality of the circumstances experienced by Cox in his working environment.

Considering the totality of the circumstances, Cox's work conditions were objectively severe and/or pervasive. Race-based comments against Cox, including repeated referencing of Cox as "boy" and even calling him the n-word, was not a "two"- or "three"-off occasion, as FCA argues. [Dkt.56 at 31]. *C.f. supra* Section IV.B.2. Andreas "had a problem with addressing [Cox] as his boy, and [Cox] told him over and over what that word meant to [Cox] and what it meant to a lot of other people,"

but Andreas "continued to address [Cox] as boy in a particular tone in a particular way, which was very insulting." Dkt.71-9 at 23-24 (Cox Dep.92:19-93:8). Freda, Smith, and FCA failed to discipline Andreas for this repeated race-based insult—they simply told him not to do it, but Andreas simply ignored them and used the term repeatedly. *E.g.*, Dkt.69-34 at FCA_1606; Dkt.74-5 at FCA_791. Moreover, Freda, Smith, and Sanders constantly monitored Cox in a campaign to terminate his employment, including by drumming up false and misleading disciplinary issues and constantly trying to antagonize Cox (e.g., by claiming he was lying; falsely asserting Hawkins complained about Cox; and claiming Cox was sleeping under suspicious circumstances). *E.g.*, Dkt.69-8 at FCA_607-609; Dkt.69-11 at FCA_606; Dkt.69-26 Dkt.71-9 at 53-54, 59 (Cox Dep.211:12-14:10, 246:11-246:22; Dkt.71-13 (Sanders Dep.82:22-83:17). Freda also explicitly told Cox he wanted him out of the met lab. [Dkt.71-12 (Freda Dep.112:14-13:17)].

All of the cases relied on by FCA involved situations with far fewer racial epithets and other harassing circumstances. In *Nichols*, the employee claimed he was called the n-word once, which "constitute[d] severe harassment" and cited "six instances of harassment" over a two-week period that were not all directed at him and involved no physical threat, and the employee "performed his job well with no complaints." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014). In *Poullard*, the employee identified "just three questionable incidents" over 14 months, 2 of which were "at worst mild and ambiguous" with a "tenuously arguable connection to race" and one remark that was taken from the *Harvard Business Review. Poullard v. McDonald*, 829 F.3d 844, 858 (7th Cir. 2016). In *Peters*, "many of the actions" that the employee "identifie[d]" as harassment "were not directed at him," and 5 of the 6 actions alleged as harassment over 1.5 years were "only mildly offensive." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002). In *Bowden*, unlike in Cox's situation, the employee admitted "she was never subjected to racial slurs or physical threats," and members of her supervisor's family, not her supervisor, "once made racially derogatory remarks."

*Bowden v. Kirkland & Ellis LLP*, No. 07 C 975, 2010 U.S. Dist. LEXIS 91730, at *37-38 (N.D. Ill. Sep.

2, 2010). Most significantly, the employee admitted "these actions did not prevent her from

discharging her duties at a high level." *Id.*

   All of these cases FCA cited contrast with Cox, who was continuously verbally harassed by the

repeated use of the term "boy" despite repeated requests for it to stop and who was subjected to a

concerted and continuous campaign by Freda, Smith, and Sanders to terminate Cox's employment

because of Cox's complaints about discrimination. Accordingly, a reasonable jury could find that

Cox's working conditions were objectively and subjectively severe and/or pervasive.

   **4. FCA should be held strictly liable and liable for failing to correct the hostile
      environment because until Cox's September 2021 transfer to another plant in late
      2021, FCA failed to correct the harassing behavior.**

   Given Freda's, Smith's, and Sanders's position as supervisors, FCA is strictly liable for the hostile

environment they created. *Harris v. FedEx Freight, Inc.*, 110 F. Supp. 3d 805, 818 (N.D. Ill. 2015). FCA

"is liable for a hostile work environment created by the employee's coworkers," if Cox "shows that

his employer has been negligent either in discovering or remedying the harassment." *Mason v. S. Ill.

Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000).

   For Andreas, Cox reported to LR that Andreas had addressed him as "boy" on numerous

occasions. During an investigation in 2018, Ronnie Gold confirmed that Andreas stated, "BOY, you

need to come to work, do your job and don't say nothing . . . shut your mouth." [Dkt.74-6 at

FCA_796; Dkt.71-9 at 20 (Cox Dep.78:17-81:1)]. Yet, no discipline resulted to Andreas, and no

follow up was conducted on this situation by FCA other than instructing Andreas not to use the term

again. [Dkt.74-6 at FCA_791; Dkt.71-12 (Freda Dep.22:6-22:11)]. In contrast, Cox was not

disciplined for his alleged "foundry" comment but instead his "knocking the fat off" comment.

[Dkt.69-17; Dkt.70-3 at FCA_788]. When Andreas continued to use the word "boy" in reference to

Cox, he was simply counseled and continued referring to Cox as "boy." [Dkt.69-34at FCA_1606;

Dkt.74-5 at FCA_791]. Cox pleaded with Freda for assistance, but Freda ignored Cox. [Dkt.71-9 at 37 (Cox Dep.146:10-48:22)]. FCA even dismissed Cox's complaint in April 2019 that Andreas had again used the word "boy" with Cox—despite a previous witness corroborating the use of the word and Andreas's own admission of using that word—because there was "no witnesses" to this last reference. [*Id.* at 37 (Cox Dep.146:10-148:22); Dkt.70-22 at FCA_105].

Even if there was no strict liability for the behavior of Sanders, Freda, or Smith, FCA was well aware of their conduct against Cox. FCA allowed Freda's, Smith's, and Sanders's conduct to persist despite numerous reports by Cox to LR, Corporate Diversity, and Biggar. *E.g.*, Dkt.70-12 at FCA_1309-11; Dkt.74-5 at FCA_791; Dkt.69-23 at FCA_756-58; Dkt.74-12 at FCA_1117-20. The Union also took numerous complaints by Cox to management, and given the structure of FCA, Union officials can "reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." [Dkt.71-9 at 12 (Cox Dep.42:21-43:5); Dkt.74-1¶34); Dkt. 69-6; Dkt.69-22; Dkt.69-28; Dkt.69-36; Dkt.69-18 ]. *Westbrook v. Ill. Dep't of Human Servs.*, No. 16 C 5685, 2018 U.S. Dist. LEXIS 48814, at *28 (N.D. Ill. Mar. 26, 2018) ("[T]he plaintiff can either follow[] the harassment policy reporting requirements or report[] the alleged harassment to anyone who had the authority to deal with the harassment or at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.").

This conduct culminated in Cox's termination for alleged sleeping in May 2021 and his forced move to a new department in June 2021. [Dkt.69-22; Dkt.74-1¶19]. Cox's working conditions continued to be adversely affected until Cox decided he had to transfer to another plant in September 2021. Because Cox left a department with a 7-day operation, his damages have continued. [Dkt.69-20; Dkt.69-21; Dkt.69-22; Dkt.70-14; Dkt.70-1 at FCA_906; Dkt.71-9 at 62 (Cox Dep.257:20-58:7)].

Because a reasonable jury could find that Cox was harassed because of his race, the Court should deny FCA's motion for summary judgment.

**C. Considering the amalgamation of circumstantial evidence, a reasonable jury could readily find that the termination of Cox's employment was based at least in part on Cox's race.**

Given the contradictions involved in Cox's termination for alleged sleeping, FCA's history of discriminatory conduct and statements against Cox, and statements by other African American employees that discrimination was ongoing, a reasonable jury could easily find Cox's race "caused" the his 2021 termination. *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023).

**1. Multiple instances of direct evidence demonstrate that FCA discriminated against Cox due to his African American race.**

**a. Andreas's bias against Cox permeated the decision to pursue the termination of Cox's employment.**

Cox can show that FCA discriminated against him because of his African American race by direct evidence including Andreas's statements that were incorporated by Smith and Freda. "Under the cat's paw theory of liability, when a biased subordinate lacks decision-making power to fire an employee, but 'uses [a] formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action,' we will consider the biased subordinate's actions as direct evidence of discrimination." *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018).

Here, Andreas—who clearly was biased against Cox based on his repeated utterances of racial epithets against Cox and other race-based comments about others—made numerous false reports about Cox that were adopted by Smith, Biggar, and Freda. Specifically, Andreas falsely told Smith and Freda that Cox was disciplined in 2018 for Cox threatening Andreas with a knife. [Dkt.70-17; Dkt.69-4 at FCA_277; Dkt.71-1 at FCA_617]. Smith admitted Andreas told him that Cox "had presented a knife to him," and he had examined Cox's disciplinary history and learned that there was a discipline in 2018 that did not include a reference to a knife. [Dkt.71-11 (Smith Dep.8:14-16, 9:6-9:16, 47:22-48:5); Dkt.69-17]. While Smith admitted he was "skeptical of the context" of this report by Andreas about the knife and knew that the discipline of Cox in 2018 did not involve a knife after he pulled Cox's disciplinary history, Smith nonetheless later stated on September 14, 2020 that "[r]umor has it

that this incident [in 2018] concerned a weapon (knife)." [Dkt.69-27 at FCA_1767; Dkt.71-11 (Smith Dep.47:22-48:11)]. Biggar similarly stated, "[F]ound out Steve has two counts of threatening and intimidation on his record," including "[o]ne in 2018 for threatening Gerard Andreas with a knife." [Dkt.70-17]. Cox's supposed threats against Andreas (that were uncorroborated by other witnesses) continued to serve as an alleged basis for Freda, Smith, and Biggar to prevent Cox from returning to the met lab in September 2020. [Dkt.70-17; Dkt.69-27; Dkt.71-11 (Smith Dep.47:22-48:11; Dkt.69-4 at FCA_277]. On Cox's return to work after the towing incident, Smith and Sanders began pursuing all possible discipline against Cox—even false discipline based on manufactured issues with Hawkins, which culminated in Cox's dismissal for alleged sleeping in May 2021. [Dkt.69-8 at FCA_607; Dkt.69-11 at FCA_606; Dkt.69-26].

Because the decisionmakers involved in this matter adopted and relied on false statements by Andreas that they knew to be false, the Court should determine that genuine issues of material fact remain and deny Defendant's Motion for Summary Judgment.

### b. Other employees noted a bias against Cox by FCA.

Multiple coworkers found a bias against Cox because of his race. For instance, Sanders specifically found a "bias" against Cox by Smith and Freda and mentioned this to Biggar. [Dkt.69-10 at FCA_732; [Dkt.69-9 at FCA_898]. A reasonable jury could find that Sanders's reference to a "bias" was related to Cox's race. *Id.* Furthermore, Carroll mentioned that Cox was being targeted for termination because of his race, and Hawkins concluded that "Jared and Kasey the one [sic] that hates you [sic] they Just [sic] needed a reason" to go after Cox. [Dkt.70-15 at Cox-502-504; Dkt.70-16 at Cox-517]. Shortly after Cox's 2021 termination, Hawkins also tried "to set up a meeting with the plant manager to discuss the problems and cultural differences that we are having in department 4380 metallurgical lab." [Dkt.70-16 at Cox-509-10]. This is further evidence of discrimination against Cox by FCA, especially in consideration

of FCA's lack of discipline against Cox for 15 years before Andreas's harassment of Cox or since Cox left the met lab.

### 2. Cox can also establish race discrimination with indirect evidence.

Indirect evidence also shows Cox was impermissibly discriminated against based on his race. The *McDonnell Douglas* framework usually requires an employee to establish a *prima facie* showing of four elements, including similarly situated comparators, but "[w]here, as here, the issue of satisfactory performance and the question of pretext overlap because the employer has raised the employee's performance as the reason for the adverse employment decision, the court may skip the analysis of the *prima facie* case and proceed directly to the evaluation of pretext." *Bragg*, 58 F.4th at 271. Although the Court may skip the *prima facie* case and move straight to the issue of pretext, Cox has multiple comparators who FCA treated more favorably than Cox.

Cox took multiple photographs of other employees who were sleeping, including employees in the same plant as Cox, under the same FCA rules and procedure but were not put on notice for sleeping even after their supervisors caught them sleeping. [Dkt.74-15; Dkt.71-12 (Freda Dep.31:15-31:17); Dkt.74-1¶¶20-26; Dkt.71-9 at 58-60 (Cox Dep.244:21-47:17, 249:7-50:24)]. Each of these individuals shared the same supervisor as Cox at the time—Jared Smith—and were subject to the same rules and procedures for discipline. [Dkt.71-11 (Smith Dep.8:14-16, 9:6-9:16, 47:22-48:5); Dkt.71-12 (Freda Dep.20:5-20:10); Dkt.69-1 at FCA_917]. Nonetheless, only Cox was put on notice. [Dkt.69-20; Dkt.69-21]. No other production technician in Cox's department was terminated for allegations of sleeping after September 1, 2018. [Dkt.74-20 at 6; Dkt.74-19 at 5].

Although FCA attempts to pass this evidence off as "inadmissible speculation" since he allegedly "cannot identify when the individuals were sleeping or who specifically saw them at that time," this mischaracterizes Cox's testimony and is demonstrably false. [Dkt.56 at 27]. As Cox testified, Andreas was asleep in multiple photographs based on his personal knowledge, and Andreas falls asleep "all the time."

[Dkt. 71-9 at 59 (Cox Dep.245:1-46:1, 247:6-247:20)]. Cox saw both Freda and Smith observe Andreas and Garnet Cripe sleeping on multiple occasions without putting them on notice, as required by FCA policy. [Dkt. 71-9 at 60 (Cox Dep.249:2-50:5)]. FCA's citation to *Gaines* is unavailing given that "Gaines offer[ed] no evidence that any K-Five supervisor was ever told or otherwise aware" of the rule violations. *Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 263 (7ᵗʰ Cir. 2014).

Further, FCA argues that "even if Cox had not identified Black co-workers who were sleeping, he cannot identify any other employee at a similar discipline step . . . who was sleeping on the job but not terminated, much less that Sanders was aware of a similarly-situated non-Black employee who was sleeping and failed to discipline them." [Dkt.56 at 29]. FCA, however, ignores that supervisors like Smith were responsible for immediately placing employees caught sleeping on notice, regardless of their discipline history, but this did not occur with other Caucasian employees in the met lab, unlike Cox. *See* Dkt.71-10 (Kucholick Dep.53:3-54:3, 55:4-55:8).

Because a reasonable jury could find that Cripe and Andreas were similarly-situated individuals who violated FCA's sleeping policy but were not put on notice, the Court should deny Plaintiff's Motion for Summary Judgment. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7ᵗʰ Cir. 2021) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination," and "[t]he 'similarly situated' prong establishes whether all things are in fact equal.")

3.  **Numerous indications show that FCA's decision to terminate Cox's employment for alleged sleeping was pretextual.**

Based on FCA's changing stories and contradictions, there is significant evidence that FCA's "non-discriminatory explanations are not credible," including that FCA's "stated reasons are not the real reasons for the employer's action, have no grounding in fact, or are insufficient to warrant the employer's decision." *Edson v. Dreyer & Reinbold, Inc.*, No. 1:15-cv-00861-TWP-MJD, 2017 U.S. Dist. LEXIS 14287, at *10-11 (S.D. Ind. Feb. 1, 2017) (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7ᵗʰ Cir. 2001);

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7ᵗʰ Cir. 2007)). Although Cox's adverse action at issue here for his discrimination and retaliation claims is his 2021 termination for alleged sleeping, FCA's behavior against Cox from July 2018 through April 2021 is relevant because it shows FCA's animus against Cox. Given FCA's suspicious behavior in not questioning Cox's termination despite numerous inconsistencies in the allegation of sleeping against Cox, FCA cannot establish Smith or Sanders "honestly" believed Cox was asleep or that Cox's termination was "objectively reasonable." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 795 (7ᵗʰ Cir. 2015).

Sanders and Smith were, in fact, running a campaign to terminate Cox's employment. For instance, Smith allegedly obtained a photo of Cox sleeping yet refused to divulge the identity of the employee who had taken the photo. [Dkt.71-13 (Sanders Dep.85:11-86:8)]. And, Smith claimed he took a photograph of Cox sleeping. [Dkt.71-11 (Smith Dep.73:8-73:11)]. Sanders said she could not obtain access to the digital photograph and the original metadata for this photo, which are crucial given the dubious nature of the photograph in question. [Dkt.71-13 (Sanders Dep.85:19-87:16)]. For example, the photo with Cox's legs on the ground contradicted Smith's description of Cox with his feet on the desk. [Dkt.69-14]. The photo also had a Christmas tree in it, although it was supposedly taken in April 2021. [Dkt.69-14; Dkt.69-15]. Cox was also wearing athletic shoes rather than the work boots that he wears while he is working, and Cox would have been subject to additional discipline if he was not wearing his work boots since he worked with chemicals. [Dkt.74-1¶13]. Because he had on athletic shoes, Cox had already completed all his assigned work for the day. [Dkt.74-1¶12]. In addition, during the timeframe that Smith accused Cox of sleeping, at least one other employee confirmed that Cox was awake. [Dkt.74-14; Dkt.69-37]. Sanders never talked to these individuals, examined these issues further, or pursued an original digital photograph of Cox. Dkt. 69-37; Dkt.71-13 (Sanders Dep.85:19-90:21)]. To conclude Cox had been sleeping, Sanders said, "[t]he photo said a lot," although photographs are not used to discipline employees for sleeping. [*Id.* (Sanders Dep.89:23-90:3)].

Furthermore, Sanders discovered Smith had manufactured allegations against Cox in February 2021. [Dkt.69-11 at FCA_606]. Yet, less than 2 months later, Sanders refused to credit a witness stating Cox was awake during the time in question and instead relied on a suspicious photograph. The evidence as to who provided this photo is even conflicting. *Compare* Dkt.71-13 (Sanders Dep.85:11-86:8) *with* Dkt.71-11 (Smith Dep.73:8-73:11). Hawkins noted concerns to FCA about "cultural differences" in the met lab the day after Cox's employment was terminated for this alleged sleeping incident, but this was ignored. [Dkt.70-16 at Cox-509-10].

Sanders informed Cox she was terminating him for sleeping on the job, although FCA did not terminate any other production technician in Cox's department for allegations of sleeping after September 1, 2018. [Dkt.74-20 at 4; Dkt.74-19 at 5]. Sanders also never considered whether Cox was on a break or whether he had finished his work for the day, although whether an employee was on a break when caught sleeping "would be a factor" in determining discipline in addition to the "[s]everity" of the sleeping incident and "past discipline history." [Dkt.71-10 (Kucholick Dep.83:22-84:6)].

FCA claims Cox had a "pattern of reported aggressive and intimidating conduct" [Dkt.56 at 28], but this ignores that Cox disputed this alleged "pattern" occurred. FCA further ignores Cox's 15-year history without discipline before August 2018 or his clean slate since his transfer from the met lab. *Fry v. Ascension Health Ministry Servs.*, No. 18-CV-1573, 2021 U.S. Dist. LEXIS 83842, at *15-16 (E.D. Wis. May 3, 2021) (citing *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("[P]revious employment history may be relevant and probative in assessing performance at the time of termination," albeit "previous employment history, standing alone, cannot create a genuine issue of triable fact when there have been substantial alterations in the employee's responsibilities and supervision in the intervening period."). In addition, Sanders investigated the issue referenced by FCA with Smith and found that she understood why Cox was upset—Smith had accused Cox of

being a liar. [71-9 at 53-54 (Cox Dep.211:12-14:10); Dkt.71-13 (Sanders Dep.82:22-83:17)]. Cox disputes the accuracy of the account referenced by Smith. *Id.* Moreover, Smith was 26 years old at the time this occurred and had been working at FCA for less than 4 years compared to Cox's over 30 years of experience, and Smith admitted he lacked sufficient training in his position. [Dkt.71-11 (Smith Dep.8:14-9:5, 16:17-16:22); Dkt.69-35 at FCA_1529].

FCA claims Cox is only arguing "Smith and Sanders disliked him," not that they were discriminating against him based on his race. [Dkt.56 at 29]. Besides being wrong, this is an issue for a jury to decide. The evidence shows that Sanders and Smith were looking for reasons and canvassing other FCA employees for pretexts to terminate Cox. Carroll specifically observed that Cox was being targeted because the "people up here [at FCA] are used to blacks who comply and (understand) how it is!" [Dkt.70-15 at Cox-502-504].

Given the suspicious circumstances surrounding Cox's termination for alleged sleeping in May 2021, a reasonable jury could find FCA's termination of Cox was pretextual.

**D.  Considering the amalgamation of circumstantial evidence, a reasonable jury could readily find that FCA terminated Cox because of his complaints of discrimination.**

Even if the photos of other employees sleeping is not direct evidence of discrimination, it certainly is evidence of retaliation. Andreas, Cripe, and Gold were caught sleeping on the job but had not complained of race discrimination. Thus, FCA treated each of these employees more favorably than Cox.

As discussed above, a reasonable jury could find that FCA began a campaign of harassment against Cox after he complained of Andreas's harassment in August 2018, culminating in Cox's terminations in August 2020 and May 2021. *See supra* Section IV.B. This campaign of harassment included close monitoring of Cox—even canvassing for complaints against Cox after September 2020. [Dkt. 71-9 at 43-44 (Cox Dep.172:16-73:15)]. "[S]urveillance 'may well be relevant evidence of retaliatory intent behind a more concrete adverse action.'" *Walker v. City of Markham*, No. 21 C 2939, 2023 U.S. Dist. LEXIS 100691, at *18 (N.D. Ill. June 9, 2023) (citing *Poullard*, 829 F.3d at 857).

In addition to FCA's pretextual termination of Cox for alleged sleeping discussed above, Cox's termination from the towing incident had multiple indications of pretext, which is highly relevant because this evidence shows FCA's motive and intent to retaliate against Cox. This towing incident and resulting discipline also allowed Smith and Sanders to terminate Cox's employment in May 2021 for alleged sleeping. [Dkt.69-17]. FCA put Cox on step 5 of the disciplinary process based on this towing issue. *Id.* Weeks before the towing incident, Martino had communicated with Biggar and others concerning Cox's complaints of discrimination against FCA. [Dkt.70-12 at FCA_1309]. Unlike any other time in his career, Martino immediately terminated Cox's employment in August 2020 without conducting an investigation or even speaking to Cox. [Dkt.71-14 (Martino Dep.58:17-59:1)]. Sanders offered changing stories as to the investigation of the towing incident, and the Misfits employees—avid fans of the Confederacy— cannot keep their story straight about Cox's alleged threats against them. *See supra* Section III (Disputed Fact Nos. 17 and 18). Although FCA permitted Cox to return to work, Cox was under intense scrutiny, and Sanders informed Cox that if she saw him in her office again, she would terminate him regardless of the veracity of the allegations against him. [Dkt.71-9 at 50-51 (Cox Dep.200:15-202:5)]. This is per se evidence that FCA was discriminating and planned to discriminate against Cox because Sanders expressly stated that she did not intend to be fair to Cox.

Because Cox has "present[ed] evidence that would permit a finding that [his] statutorily protected activity led to" his termination for alleged sleeping, a reasonable jury could find Cox was terminated in retaliation for his complaints of discrimination." *Bragg*, 58 F.4th at 274-75.

## V.      CONCLUSION.

Because a reasonable jury could find in Plaintiff Steven J. Cox's favor, the Court should deny Defendant's Motion [Dkt.55] in its entirety and allow Cox to present his claims to a jury.

Respectfully submitted,

*s/ Sandra L. Blevins*
Sandra L. Blevins, Atty. No. 19646-49
Jamie A. Maddox, Atty. No. 26522-49
Courtney E. Endwright, Atty. No. 30557-49

*Attorneys for Plaintiff Steven J. Cox*

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, IN 46204
Phone: (317) 687-2222
Fax: (317) 687-2221
Email:  sblevins@betzadvocates.com
        jmaddox@betzadvocates.com
        cendwright@betzadvocates.com
        litigation@betzadvocates.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2023, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/ Sandra L. Blevins*
Sandra L. Blevins

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, IN 46204
Phone: (317) 687-2222
Fax: (317) 687-2221
Email:  cendwright@betzadvocates.com
            litigation@betzadvocates.com

37