UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN J. COX, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:22-cv-01279-JMS-MJD |
| FCA US, LLC, | ) | |
| *Defendant.* | ) | |

**<u>ORDER</u>**

Plaintiff Steven Cox, a Black male, has worked for Defendant FCA US, LLC ("<u>FCA</u>") since July 1989.  In July 2018, Mr. Cox was the subject of racial slurs from a co-worker and reported the situation to his supervisors.  Mr. Cox's employment relationship with FCA was filled with tension thereafter.  He was ultimately terminated in May 2021, but after filing a union grievance that challenged his termination, he was brought back to work in a different position.  Mr. Cox then sued FCA for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("<u>Title VII</u>").  FCA has filed a Motion for Summary Judgment, [Filing No. 55], and Mr. Cox has filed a Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 84].[1]  The motions are ripe for the Court's consideration.

---

[1] A note on Mr. Cox's response brief: it does not follow the Court's citation format, which complicates and unduly prolongs the Court's review of the motion and briefs; it uses copious amounts of single-spacing in contravention of the Court's page limits and Local Rule 5-1; and it was not accompanied by a courtesy copy as required by the Court's Practices and Procedures. [Filing No. 78.]  After FCA highlighted the impermissible use of single-spaced text, counsel for Mr. Cox stated that they "frequently make[] single-spaced, bullet point lists in their motion practice and briefing and has done so in statement of material fact in dispute in summary judgment briefing." [Filing No. 87 at 2.]  This point is unpersuasive (a normal practice of not following the rules does nothing for absolution) and does not address the other failings.  Counsel for Mr. Cox, who frequently litigate in this Court, are cautioned to follow the Local Rules and this Court's Practices and Procedures in future filings.

# I.
## MOTION FOR LEAVE TO FILE SURREPLY

Before analyzing the parties' substantive arguments in connection with the Motion for Summary Judgment, the Court will consider Mr. Cox's Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment.   [Filing No. 84.]   This is necessary because the motion relates to the scope of information that the Court will consider in deciding the Motion for Summary Judgment.

In support of his motion, Mr. Cox argues that a surreply is appropriate because: (1) FCA objected to the admissibility of certain evidence that Mr. Cox relied upon in his Amended Response in Opposition to Defendant's Motion for Summary Judgment; and (2) FCA raised new legal arguments in its Reply in Support of Motion for Summary Judgment.   [Filing No. 84; Filing No. 84-1.] The Court addresses each argument in turn.

### A.  Admissibility of Certain Evidence

Mr. Cox argues that a surreply is appropriate because FCA objected to the admissibility of certain evidence in its reply.   [Filing No. 84; Filing No. 84-1.]  In response, FCA acknowledges that Mr. Cox is entitled to a surreply to the extent it responds to FCA's objections to the admissibility of certain evidence.   [Filing No. 86 at 1-2.]

Local Rule 56-1(d) provides that "[a] party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply . . . must be limited to the new evidence and objections."  Based on Local Rule 56-1(d), the Court **GRANTS IN PART** Mr. Cox's Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 84], to the extent it only considers the portions of the surreply which address FCA's objections to his evidence.

2

*1. Merits of FCA's Objections*

In his surreply, Mr. Cox argues that FCA's objections that several statements are hearsay fail to articulate why the statements are hearsay, which results in waiver of the objections. [Filing No. 84-1 at 3.] FCA does not address this argument in its response. [Filing No. 86.]

Indeed, FCA generally alleges that statements are hearsay without ever constructing an argument as to why. [*See* Filing No. 81 at 3-4.] The failure of FCA to develop its arguments as to why certain evidence is inadmissible hearsay is "enough to dispense with" those arguments. *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) (finding that a party's lack of articulation as to why statements were inadmissible hearsay was reason enough to overrule the objections). Accordingly, the Court **OVERRULES** FCA's conclusory and undeveloped objections. In any event, FCA's objections implicate immaterial or irrelevant evidence and duplicative evidence that is admissible from another source. Further, the Court is capable of determining admissibility and relies on only material and admissible evidence.[2]

### B. New Legal Arguments and Accompanying Supplemental Evidence

Mr. Cox also argues that a surreply is appropriate because FCA raised new legal arguments in its reply. [Filing No. 84; Filing No. 84-1.] Specifically, Mr. Cox argues that the following constitute "new arguments" on reply: FCA's position that Mr. Cox misstated evidence in his response; FCA's position that Mr. Cox disputed evidence that FCA did not rely upon; FCA's

---

[2] Alongside his Amended Response in Opposition to Defendant's Motion for Summary Judgment, Mr. Cox attaches an additional and improper argument as a so-called demonstrative "Timeline of Events" exhibit "[f]or the Court's convenience and reference." [Filing No. 78 at 3; Filing No. 74-22; Filing No. 87 at 3.] However, Mr. Cox asserts that the "events covered in the [exhibit] are already included in" his response. [Filing No. 87 at 3.] Therefore, the Court need not consider the redundant exhibit. The Court also does not consider FCA's similarly formatted attachment in reply, since FCA "drafted its reply to stand alone in full response to [Mr.] Cox's opposition." [Filing No. 81 at 3.] Such timelines are thinly disguised argument and would be both proper and perhaps helpful if included the parties' briefs within the page limit established by Local Rules.

dispute of certain facts; and FCA's interpretation of certain facts. [Filing No. 84-1 at 9-15.] Mr. Cox also attaches fifty-four pages of supplemental evidence. [Filing No. 84-3; Filing No. 84-4; Filing No. 84-5.]

In response, FCA argues that it did not inject new arguments into its reply brief, but rather responded to Mr. Cox's arguments. [Filing No. 86 at 2-3.] FCA asserts that a moving party is allowed to argue on reply that the non-movant misinterpreted evidence. [Filing No. 86 at 6-7.] FCA also argues that Mr. Cox is attempting to rehash his arguments and get the last word. [Filing No. 86 at 9-10.]

In reply, Mr. Cox reiterates his same arguments. [Filing No. 87.]

In addition to allowing a surreply to address objections to the admissibility of evidence, Courts have discretion to allow a surreply when the movant raises new arguments in a reply brief. *Meraz-Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2011); *Stringham v. Carmel Clay Schs.*, 2024 WL 51185, at *6 (S.D. Ind. Jan. 4, 2024). "Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Reis v. Robbins*, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015). This rule "serves to prevent the nonmoving party from being sandbagged." *Id.*

Here, the Court agrees with FCA that it did not raise new legal arguments in its reply brief—it merely responded to Mr. Cox's arguments and asserts that the evidence should be interpreted differently that how Mr. Cox presents it, both of which are permissible. *Stringham*, 2024 WL 51185, at *6-7 (stating that rebuttal arguments are proper as well as arguing for a different interpretation of evidence than the plaintiff argued in response). Mr. Cox is not "sandbagged" by anything in FCA's reply, and a surreply is not necessary to further argue factual disputes given that, at this stage of the proceeding, the Court resolves disputed facts in Mr. Cox's

favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008) (explaining that on summary judgment, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor).  Accordingly, the Court **DENIES IN PART** Mr. Cox's Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 84], to the extent it argues that FCA raised new legal arguments in its reply and attaches new evidence in support.

## II.
### MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst*, 512 F.3d at 907.  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  Statement of Facts

Before setting forth the facts, the Court notes its displeasure with the parties' summary judgment practice, which includes page after page of inefficient argument, rambling presentation of evidence and information,[3] fact disputes that are not material or relevant to the legal questions,

---

[3] The parties submitted a total of 1,288 pages of evidence across 119 exhibits and 138 pages of briefing.

and FCA's wholly inappropriate insistence that factual disputes and ambiguities be resolved in its favor. Such practices make for an unnecessarily cumbersome review. The Court has done its best to sift through the parties' overinclusive factual statements and does not set forth irrelevant or immaterial facts below.

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### 1. Mr. Cox's Employment at FCA

Mr. Cox, a Black man, began working for FCA in July 1989. [Filing No. 69-14; Filing No. 70-1 at 1.] Throughout his employment, Mr. Cox has held several different positions at FCA. [Filing No. 70-1.] In 2016, Mr. Cox began working at the metallurgical lab as an hourly chemical technician. [Filing No. 70-1; Filing No. 71-9 at 17.] In this role, Mr. Cox reported to Anthony Freda until September 2018 when Jared Smith became Mr. Cox's supervisor and Mr. Freda became Mr. Smith's supervisor. [Filing No. 55-5 at 8-9; Filing No. 71-9 at 9; Filing No. 71-12 at 6; Filing No. 74-1 at 6.] Both Mr. Smith and Mr. Freda are White males. [Filing No. 74-2 at 6.]

### 2. Mr. Cox Begins Experiencing Issues with Co-workers

In July 2018, Mr. Cox was at work conversing with co-workers Gerard Andreas, a White metallurgical technician who worked on the same shift as Mr. Cox, and Ronnie Gold. [Filing No. 55-1 at 52; Filing No. 55-1 at 58-66; Filing No. 55-1 at 70-72.] The conversation between Mr. Cox, Mr. Andreas, and Mr. Gold was about a different co-worker, Ronnie Davis, who had taken an extra vacation day but failed to notify Mr. Cox, which made Mr. Cox upset. [Filing No. 55-1

at 70-72; Filing No. 70-2 at 4-5; Filing No. 74-6 at 1-2.]  Mr. Cox jokingly told the others that he would "knock the fat off [Mr.] Davis's face," but neither Mr. Andreas nor Mr. Gold took it as a joke.  [Filing No. 70-3 at 1; Filing No. 71-9 at 30.]  In response to Mr. Cox's comment regarding Mr. Davis, Mr. Andreas told Mr. Cox, "Boy, you need to come to work, do your job, and don't say nothing."  [Filing No. 71-9 at 23.]  Mr. Andreas had used racial slurs towards Mr. Cox before, including repeatedly calling Mr. Cox "boy," despite Mr. Cox telling Mr. Andreas "over and over again what that word ['boy'] meant" when used in reference toward a Black person.  [Filing No. 55-1 at 60; Filing No. 55-1 at 72-76.]

> ### 3. Mr. Cox Reports Mr. Andreas' Comment; Mr. Andreas Reports Mr. Cox's Comment

Mr. Cox reported Mr. Andreas' comment to his union representative and Mr. Freda.  [Filing No. 55-1 at 61-63.]  Mr. Andreas also reported Mr. Cox's comment to Mr. Freda and "stated that he would like to get [FCA's] Labor Relations [Department] involved."  [Filing No. 74-10.]  Mr. Freda emailed FCA's Labor Relations Department employee Stacy Chasteen a week later to notify her of the incident between Mr. Cox, Mr. Andreas, and Mr. Gold.  [Filing No. 74-10.]

Ms. Chasteen investigated the conversation that had occurred between Mr. Cox, Mr. Andreas, and Mr. Gold.  [See Filing No. 70-3; Filing No. 74-5; Filing No. 74-6.]  Pending the outcome of the investigation, Mr. Freda put Mr. Cox "on notice" for a FCA Standards of Conduct violation due to his comment about fighting Mr. Davis, and Ms. Chasteen instructed Mr. Freda to also put Mr. Andreas "on notice" for his comment to Mr. Cox.  [Filing No. 72-14 at 2.]  Mr. Andreas, however, was actually never put "on notice" by Mr. Freda or anyone else.  [Filing No. 72-14 at 1.]

During the investigation, Mr. Andreas told Ms. Chasteen that Mr. Cox "yells at [Mr. Freda]," "yells all day long and gets mad," and a few days after the above interaction, made a

threatening comment to him that they could "take it outside and fight it out like men," which he reported to Mr. Freda. [Filing No. 74-5 at 3-5.] Mr. Andreas also told Ms. Chasteen that he would like Mr. Cox "moved to a different area since he fought with every employee in the Lab" in response to Ms. Chasteen asking Mr. Andreas what resolution he was looking for. [Filing No. 74-5 at 5.] Ms. Chasteen followed up with Mr. Freda, who told her that Mr. Cox does not "necessarily yell at him, but he does get loud" and that Mr. Cox "is a damn good worker." [Filing No. 69-31 at 1-2.] Ms. Chasteen also followed up with three employees who Mr. Andreas mentioned were present and might have heard when Mr. Cox made the comment that they could "take it outside and fight it out like men," but the three employees told Ms. Chasteen that they did not hear such a comment from Mr. Cox. [Filing No. 74-7 at 1; Filing No. 74-8; Filing No. 74-9.]

Before the investigation concluded, Mr. Freda emailed Ms. Chasteen asking for a status update on the investigation and noted that "[c]onditions [had] worsen[ed]" amongst the employees involved. [Filing No. 72-14 at 1.] At the end of the investigation, Mr. Cox was "issued a written warning with counseling (Step 3)" based on his comment of "knocking the fat off" Mr. Davis. [Filing No. 70-3 at 1.] Mr. Andreas was not formally disciplined. [See Filing No. 74-5 at 2.]

### 4. The Issues Continue in 2019

Mr. Andreas continued using racial slurs towards Mr. Cox, including muffling "n***er," and in February 2019, continued using "boy" to reference Mr. Cox. [Filing No. 69-34; Filing No. 71-9 at 37.] Mr. Cox again reported Mr. Andreas to his union representative, and Mr. Freda and Mr. Smith were made aware of the incident. [Filing No. 69-34.] Mr. Smith, Mr. Freda, and Mr. Cox met to discuss the incident, and Mr. Cox informed them of the racial slur and that he felt like Mr. Andreas was assigning him extra work in a retaliatory manner. [Filing No. 69-34.] Mr. Freda

told Mr. Cox that he would "address the statement that Mr. Andreas made that [Mr. Cox] perceived as a racial remark." [Filing No. 69-34.]

Mr. Freda later met with Mr. Andreas regarding the incident.  [Filing No. 69-34.]  Mr. Andreas told Mr. Freda that he did not intend his statement to be racist.  [Filing No. 69-34.]  Mr. Freda told Mr. Andreas to balance out the work better and "that depending on the interpretation of Mr. Cox, [his racial slur] could be perceived [as racist] and to not make similar statements in the future." [Filing No. 69-34.]  Mr. Andreas then requested to move to a different shift, which was granted.  [Filing No. 69-34; *see* Filing No. 70-23 at 4.]

### 5.  *Mr. Cox Again Reports Mr. Andreas for Calling Him "Boy"*

In April 2019, Mr. Cox again reported to Mr. Smith and Mr. Freda that Mr. Andreas told him to "just do the work, boy" and called him "5x boy," which Mr. Cox understood to mean "fat boy." [Filing No. 70-21 at 1-2.]  Mr. Smith "did not seem concerned" and to Mr. Cox's knowledge, Mr. Smith "did not report the matter to Human Resources." [Filing No. 70-21 at 1.]  Mr. Cox also stated that both Mr. Smith and Mr. Freda "verbally attacked him and defended [Mr.] Andreas' use of the word 'boy', laughing at [Mr. Cox] and calling him a liar." [Filing No. 70-21 at 2.]  Mr. Cox asked Mr. Smith and Mr. Freda "why, when he presents issues about his white co-workers, nothing happens" "[b]ut when his white co-workers complain about him, an email is sent out to [Ms.] Chasteen (Labor Relations)." [Filing No. 70-21 at 2.]  Mr. Freda "leaned back in his chair and laughed at [Mr. Cox's] request." [Filing No. 70-21 at 2.]

After this interaction, Mr. Cox was upset, shaking, and "feared for his health." [Filing No. 70-21 at 2.]  He reported both instances to his union representative and asked for help.  [Filing No. 70-21 at 2.]  The union representative spoke to Mr. Smith and Mr. Freda about how Mr. Andreas' comments "could be [] racial and should be taken seriously," but according to Mr. Cox, "they both

disregarded" the union representative's assessment.  [Filing No. 70-21 at 2; Filing No. 70-21 at 5-7.]

### 6.  *Mr. Cox Files a Formal Complaint*

Shortly thereafter, in early May 2019, Mr. Cox filed a formal complaint via FCA's online internal ethics portal.  [Filing No. 70-5.]  The report included allegations that Mr. Andreas "called him '5x boy' and told him 'just do the work, boy,'" and that both Mr. Smith and Mr. Freda ignored Mr. Cox's complaint when he brought it to them.  [Filing No. 70-5 at 1-2.]  FCA investigated the complaint and concluded that it could not confirm that Mr. Andreas called Mr. Cox "boy," but did confirm Mr. Andreas' use of "5x."  [Filing No. 70-5 at 3.]  FCA "addressed" and "[v]erbally [c]ounseled" Mr. Andreas for his use of "5x."  [Filing No. 70-5 at 3.]  FCA's investigation notes do not address Mr. Cox's complaint that Mr. Smith or Mr. Freda ignored his pleas for help.  [Filing No. 70-5.]

### 7.  *Mr. Andreas Files a Formal Complaint to Retaliate Against Mr. Cox*

About two weeks later on May 22, 2019, Mr. Andreas filed a complaint via the online internal ethics portal against Mr. Cox, alleging that in March 2019 Mr. Cox told him that he was "old and useless" and accusing him of stealing from the company and "falsifying data on the job." [Filing No. 70-24 at 1-3.]  Mr. Andreas also noted that Mr. Cox carries a knife and tells people that he has a gun permit and a gun in his car.  [Filing No. 70-23 at 4.]  FCA investigated the complaint and determined that Mr. Andreas filed the complaint "out of retaliation" against Mr. Cox due to Mr. Cox's complaint of racial discrimination against Mr. Andreas just weeks prior. [Filing No. 70-23 at 5.]

8. *Mr. Smith Disciplines Mr. Cox for Raising His Voice and Refusing to Follow an Order*

On July 31, 2019, Mr. Cox was written up and disciplined by Mr. Smith for "respond[ing] aggressively" toward him and another employee, Andrew Plummer, who expressed interest in getting trained on Mr. Cox's job. [Filing No. 69-36.] Mr. Smith indicated in the write-up that Mr. Cox raised his voice and refused to follow his instructions to train Mr. Plummer. [Filing No. 69-36.] Mr. Cox, however, was not given a "direct order" by Mr. Smith to train Mr. Plummer, [Filing No. 71-9 at 39], which is usually given by a supervisor before deeming an employee to be insubordinate, [Filing No. 71-14 at 15].

9. *Mr. Cox Transfers Shifts and Reports Another Issue with Mr. Andreas*

In September 2019, Mr. Cox transferred to a different shift "to get away from [Mr.] Smith." [Filing No. 71-9 at 18; Filing No. 71-2.] In October 2019, another incident occurred between Mr. Andreas and Mr. Cox regarding a note that Mr. Andreas wrote on a white board that made Mr. Cox upset. [Filing No. 69-35 at 14.] Mr. Cox reported what happened to Mr. Smith, who felt the complaint was "childish" and raised his voice at Mr. Cox, telling him that "he could take it to HR." [Filing No. 69-35 at 14.] The next day, Mr. Smith "talked to [Mr. Cox] in private and apologized for being unprofessional" and "asked if anything else happened last night," to which Mr. Cox said "no." [Filing No. 69-35 at 14.]

10. *Mr. Cox's Car Is Towed and He Is Terminated*

On August 25, 2020, Mr. Cox's car was towed from the FCA parking lot. [Filing No. 71-9 at 44-45; Filing No. 72-17 at 3-8.] His car was parked in a no parking zone, but he had previously received permission to park there. [Filing No. 71-9 at 44; Filing No. 72-17 at 3-8; Filing No. 55-4 at 12-15; Filing No. 55-4 at 20-24.] When Mr. Cox realized his car had been towed, he called FCA security, and they informed him that Misfits Towing had towed his car. [Filing No. 71-9 at

45-46; *see* Filing No. 72-17 at 3.]  Misfits Towing is a third-party towing company that FCA calls when it needs a car towed.  [Filing No. 72-17 at 3; Filing No. 71-15 at 3.]  Mr. Cox called Misfits Towing and went to pick up his car.  [Filing No. 71-9 at 46-47.]  On his way home, Mr. Cox called Misfits Towing to ask how many cars it towed from FCA the night it towed his car.  [Filing No. 71-9 at 46-47.]  The Misfits Towing employee refused to answer Mr. Cox's question and started to yell and cuss at Mr. Cox, who responded in kind by saying, "Don't touch my fucking car again." [Filing No. 71-9 at 46-47.]  Mr. Cox called back to apologize to the Misfits Towing employee moments after the initial phone call ended.  [Filing No. 71-9 at 46-47.]  The Misfits Towing employee called the Kokomo police and stated that Mr. Cox threatened to kill them all in a drive by shooting.  [Filing No. 69-40; Filing No. 71-15 at 3-4.]  Mr. Cox denies ever making any threats and told the Kokomo police that he did not make any threats.  [Filing No. 71-9 at 46.]  The Kokomo police closed out its report within 37 minutes of its submission as a "low" priority and concluded that there was not a threat in progress.  [Filing No. 69-40.]

Back at FCA, Joe Martino, a White Labor Relations employee, was assigned to investigate Mr. Cox's behavior after his car was towed. [Filing No. 55-4 at 17-19; Filing No. 71-13 at 11-13; Filing No. 74-1 at 6.]  Labor Relations employees are expected to conduct an investigation or interview all parties "before discipline is issued." [Filing No. 71-10 at 10.]  However, Mr. Martino immediately terminated Mr. Cox's employment the same day "for threatening behavior toward FCA [ ] security and [Misfits Towing]." [Filing No. 55-3 at 2; Filing No. 69-24.]

### 11. *Mr. Cox Reports His Termination to the Union and a Grievance is Filed on His Behalf*

Mr. Cox reported his termination to his union representative, who then initiated a grievance procedure with Kasey Sanders, a White Labor Relations supervisor. [Filing No. 71-13 at 4; Filing No. 71-13 at 11; *see* Filing No. 71-9 at 48; Filing No. 74-1 at 6.]  FCA investigates all terminations.

[Filing No. 71-13 at 11-12.]  About a week after the union complained to Ms. Sanders, she found out that Mr. Martino was not investigating the incident at all, so Ms. Sanders took over.  [Filing No. 71-13 at 11-12.]  Ms. Sanders then interviewed Mr. Cox, the FCA security personnel that Mr. Cox spoke with, and the employees from Misfits Towing.  [Filing No. 71-13 at 12.]  She ultimately concluded that Mr. Cox's termination was unwarranted, [Filing No. 71-13 at 12], but told Mr. Cox that if he had any further issues after coming back, she would terminate him immediately, [Filing No. 71-9 at 50-51.]

*12. Mr. Cox Returns to Work*

Mr. Cox returned to work, but his badge was still deactivated in FCA's system, so security did not let him in.  [Filing No. 71-9 at 49; Filing No. 71-13 at 16.]  The issue with Mr. Cox's badge was not completely fixed on his second day back, so he was still held up at security.  [Filing No. 71-13 at 16.]  Ms. Sanders thought the issue was fixed after the first day and had a meeting with Mr. Cox the second day interrogating him about why he was late and whether he had even worked at all.  [Filing No. 71-13 at 16-17; Filing No. 72-3 at 3-4.]  The meeting was characterized as intimidating and harassing both by Mr. Cox and his union representative who was present.  [Filing No. 71-9 at 51-52; Filing No. 72-5 at 2.]  Ms. Sanders stated to Mr. Cox, "I told you you'd be in deep shit if back up in Labor [Relations]."  [Filing No. 72-5 at 2.]  However, once Ms. Sanders heard Mr. Cox's side of the story and that his issue with his badge persisted, she apologized for how she addressed the matter with Mr. Cox.  [Filing No. 71-9 at 51.]

*13. Mr. Cox Files a Complaint Against Ms. Sanders*

Mr. Cox initiated a union grievance against Ms. Sanders for her handling of the matter. [Filing No. 71-9 at 51-52.]  The grievance against her was for retaliation and harassment based on race.  [Filing No. 71-9 at 51.]  Mr. Cox, however, did not have control over the language that the

14

union used on the actual grievance form, which ended up only alleging that Ms. Sanders harassed and intimidated him when questioning him.  [Filing No. 71-9 at 51-52; Filing No. 72-5.]  FCA investigated the matter and concluded that Ms. Sanders "acted appropriately considering the amount of times [Mr. Cox] has been to Labor Relations after getting his job back."  [Filing No. 72-5 at 4.]  Mr. Cox had two interactions with Labor Relations (to get his badge activation sorted out) after getting his job back.  [Filing No. 71-13 at 16-17; Filing No. 72-3 at 3-4.]

### 14. Mr. Smith Reports Mr. Cox

Over the next few months, Mr. Cox was "closely monitor[ed]" by both Ms. Sanders and Mr. Smith.  [Filing No. 71-9 at 59; Filing No. 74-1 at 2.]  On December 9, 2020, Mr. Smith informed Labor Relations that Mr. Cox was having issues with a co-worker, Tony Hawkins.  [*See* Filing No. 72-6 at 1.]  In February 2021, Mr. Smith continued to report that Mr. Hawkins was being harassed by Mr. Cox and that there were other employees who were uncomfortable around Mr. Cox.  [Filing No. 72-7 at 1.]  He stated that Mr. Cox's "behavior is well documented over many instances and many years" and that the lab "cannot function with that type of behavior and bullying as a result of ONE employee."  [Filing No. 72-2 at 1 (emphasis in original).]  Ms. Sanders investigated the alleged issues and discovered—from Mr. Hawkins—that Mr. Hawkins did not lodge any complaints against Mr. Cox and did not have any issues with Mr. Cox.  [Filing No. 72-7 at 1; Filing No. 72-7 at 3.]  Ms. Sanders' investigation notes indicate that she spoke with both Mr. Freda's and Mr. Smith's supervisor, Martin Biggar, about Mr. Freda's and Mr. Smith's "perceived negative bias toward [Mr.] Cox."  [Filing No. 72-7 at 1.]

### 15. An Incident Occurs Between Mr. Cox, Mr. Freda, and Mr. Smith

On March 8, 2021, Mr. Cox, Mr. Freda, Mr. Smith, and others met regarding an injury that Mr. Cox sustained.  [Filing No. 69-12.]  The meeting was very tense from the start.  [Filing No.

69-12 at 1.] Mr. Cox had begun to explain what happened when Mr. Smith kept interrupting and correcting him. [Filing No. 69-12 at 1.] One witness described the encounter as Mr. Smith "poking the bear." [Filing No. 69-12 at 1.] Mr. Cox became upset by Mr. Smith's interjections and pointed his finger at Mr. Smith, called him a liar, and left the room. [Filing No. 69-12 at 2.] He returned approximately five minutes later with a calm demeanor, and the conversation continued without incident. [Filing No. 69-12 at 2.]

> ### 16. Mr. Smith and Mr. Freda Report the Incident and Ms. Sanders Investigates

Mr. Smith and Mr. Freda reported the incident to Ms. Sanders and indicated that Mr. Cox should be transferred. [Filing No. 69-12 at 3.] Ms. Sanders investigated and on March 17, 2022, determined that she would not be pursing discipline against Mr. Cox. [Filing No. 69-12 at 1.] Mr. Freda disagreed, was dissatisfied, and requested Mr. Cox be removed from the metallurgical lab department, but Ms. Sanders denied the request. [Filing No. 69-12 at 1.]

> ### 17. Mr. Smith Files Reports Against Labor Relations Employees for Not Thoroughly Investigating Issues

At some point after the most recent incident, Mr. Smith filed complaints against Ms. Sanders, Ms. Chasteen, and another Labor Relations employee for not thoroughly investigating complaints and issues. [Filing No. 55-7 at 19-20.]

> ### 18. Mr. Smith Reports that Mr. Cox Was Sleeping on the Job and Mr. Cox Is Terminated

On April 21, 2021, Mr. Smith emailed Ms. Sanders that he observed Mr. Cox "sleeping on the job." [Filing No. 69-19.] Sleeping is a policy violation, but Mr. Cox had witnessed multiple White employees sleep at FCA and not get terminated. [Filing No. 74-1 at 4; Filing No. 71-9 at 58-59.] Mr. Smith told Mr. Cox that he was "on notice" and notified his union representative and Ms. Sanders. [Filing No. 69-19.]

Mr. Smith had submitted a photograph to Ms. Sanders of Mr. Cox apparently sleeping at a desk while he was on shift.  [Filing No. 71-13 at 21.]  Ms. Sanders asked Mr. Smith if he took the photograph in order to verify when the photograph was taken and its accuracy, but he did not disclose that information.  [Filing No. 71-13 at 21-22.]  Mr. Smith, however, later testified that he took the photograph.  [Filing No. 71-11 at 17.]

The photograph shows Mr. Cox leaned back in a chair, with his feet on the ground.  [Filing No. 69-14.]  The photograph is taken from behind and to the side of Mr. Cox, so his eyes are not visible.  [Filing No. 69-14; Filing No. 71-13 at 21.]  There is also a Christmas tree in the photograph even though it was April and Christmas trees are not put out until the holiday season and then are removed shortly after, and Mr. Cox is wearing athletic shoes instead of lab-safe work boots, which meant that Mr. Cox was done with work for the day.  [Filing No. 69-14; Filing No. 74-1 at 2-3.]  Another employee confirmed that he was with Mr. Cox in a meeting with a third employee at the time that Mr. Smith accused Mr. Cox of sleeping.  [Filing No. 74-14.]  Nevertheless, Ms. Sanders proceeded with Mr. Cox's termination based on the photograph.  [Filing No. 71-13 at 22.]  Mr. Cox was terminated on May 4, 2021.  [Filing No. 69-20.]

### 19. Mr. Cox Files a Complaint and His Union Submits a Grievance on His Behalf

On May 7, 2021, Mr. Cox submitted a complaint of retaliation against Mr. Smith.  [Filing No. 74-12 at 3-6.]  Mr. Cox's union also initiated a grievance procedure over his termination.  [Filing No. 72-13.]

### 20. Mr. Cox Is Offered to Return to FCA through a Reinstatement Agreement

In June 2021, in exchange for settling the grievance, Mr. Cox was told that he could return to work in a different department, or his termination would remain in effect.  [Filing No. 55-1 at 217-18; Filing No. 74-1 at 4.]  Switching departments meant taking a pay cut because the new

department was not a 7-day operation department.  [Filing No. 74-1 at 4.]  Mr. Cox felt forced to

accept the departmental transfer to avoid termination.  [Filing No. 74-1 at 4.]  Mr. Cox signed the

one-page conditional reinstatement agreement ("Reinstatement Agreement"), which stated in full:

> Effective 05/04/2021, you were properly discharged from the Company for violation of the Standards of Conduct.
>
> Through extensive discussions with the Union, the Company has agreed to provide you with a reinstatement opportunity under the following conditions:
>
> 1. You agree that all grievances, charges, claims, and/or complaints that were filed or that could have been filed that concern your termination of employment are resolved.
>
> 2. Upon your return to work, your discharge will be amended to a suspension. Your reinstatement date will be 06/07/2021.
>
> 3. It is understood that you will be effectively disqualifying yourself from 4380 and will assume a labor move into department 7500.
>
> 4. You will receive 40 hours pay at straight time for the period during which you were away from the facility.
>
> 5. It is understood and agreed that you will abide by all shop rules, Standards of Conduct, and corporate policies, and that any violation may warrant discipline up to and including discharge.
>
> 6. It is understood that your current step in the disciplinary process will be modified to a step 3, Written Warning with Counseling for the incident occurring with on 04/21/2021.
>
> I have read these conditions and fully Understand them.  I agree to these conditions without reservation.

[Filing No. 55-2 at 26.]  The Reinstatement Agreement did not have a descriptive title or heading,

and Mr. Cox was never told that FCA characterized it as a "Last Chance Agreement."[4]  [Filing No.

---

[4] In its briefings, FCA repeatedly characterizes the Reinstatement Agreement as a "Last Chance Agreement."  [*See* Filing No. 56 at 15.]

55-2 at 26; Filing No. 74-1 at 3.]  Mr. Cox did not have legal representation.  [Filing No. 74-1 at 3.]

Mr. Cox did not have any issues with Labor Relations or co-workers after changing departments.  [Filing No. 71-9 at 62.]

    *21. This Lawsuit*

Mr. Cox filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 1, 2021, alleging that FCA discriminated and retaliated against him based on his race in violation of Title VII.  [Filing No. 55-2 at 50-51.]  In June 2022, Mr. Cox filed this lawsuit, asserting the same.  [Filing No. 1.]

**C.  Discussion**

Mr. Cox asserts two claims in his Complaint: (1) racial discrimination in violation of Title VII; and (2) retaliation after engaging in a protected activity (submitting internal complaints regarding discrimination) in violation of Title VII.  [Filing No. 1.]  FCA moved for summary judgment on both claims, which the Court addresses in turn after addressing the parties' arguments regarding a hostile work environment claim that was not asserted in Mr. Cox's Statement of Claims.  [Filing No. 1; Filing No. 50.]

    *1.  Hostile Work Environment Claim*

In his Statement of Claims, Mr. Cox asserts that at trial, he intends to prove that FCA "violated [Title VII] by discriminating against [him] because of his race, African American, and retaliating against [him] because of his reports of race discrimination, including by disciplining him more harshly than other similarly-situated Caucasian employees, threatening discipline against him, temporarily terminating his employment, and ultimately demoting [him]."  [Filing No. 50 at 1.]  Nowhere in his three-page Statement of Claims does Mr. Cox use the words

"harassment" or "hostile work environment." [Filing No. 50.] Nevertheless, FCA argued in support of its Motion for Summary Judgment that, in addition to Mr. Cox's discrimination and retaliation claims, his "harassment" claim fails because he cannot show that his work environment was sufficiently hostile to support such a claim. [Filing No. 56 at 30-33.] In response, Mr. Cox argues that a reasonable jury could find that he was subjected to a hostile work environment, in addition to discrimination and retaliation. [Filing No. 78 at 22-36.] But because Mr. Cox did not specifically state a hostile work environment claim or theory in his Statement of Claims, the Court need not address the parties' spontaneous arguments regarding a hostile work environment claim. *See Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (finding "no abuse of discretion in the district court's enforcement of its requirement that [the plaintiff] specifically state his theories of relief" in the Statement of Claims). The Court proceeds to address the parties' arguments regarding Mr. Cox's discrimination and retaliation claims.

### 2. *Discrimination and Retaliation Claims*

#### a. Adverse Employment Act at Issue

FCA argues that Mr. Cox's discrimination and retaliation claims are limited to his termination for sleeping in May 2021 because he did not timely file an EEOC Charge regarding prior events such as the August 2020 car towing incident. [Filing No. 56 at 23.] In response, Mr. Cox clarifies that the adverse action anchoring both of his claims "is his 2021 termination for alleged sleeping" and that prior events are included to show that FCA's decision was pretextual. [Filing No. 78 at 32-33.] FCA does not address Mr. Cox's clarification on reply. [*See* Filing No. 81 at 7-17.]

Since Mr. Cox clarified that his claims revolve around FCA's termination of him in May 2021 due to alleged sleeping on the job and that he is not seeking relief for any prior adverse

actions, the Court finds that the only adverse action at issue for both claims is Mr. Cox's termination in May 2021 for allegedly sleeping and focuses on such moving forward.

b. <u>Waiver of Claims Via the Reinstatement Agreement</u>

In support of its Motion for Summary Judgment, FCA argues that Mr. Cox knowingly and voluntarily waived his claims relating to his termination for sleeping on the job when he signed the Reinstatement Agreement. [Filing No. 56 at 25.] Thus, it contends that Mr. Cox's claims cannot proceed and cites an out of Circuit district court case *Mundy v. City of Pittsburgh*, 2022 WL 2068586 (W.D. Pa. June 8, 2022), in support. [Filing No. 56 at 25-26.]

In response, Mr. Cox argues that he did not knowingly or voluntarily waive his legal claims and highlights that he did not have legal counsel when the Reinstatement Agreement was executed, that he was told that the Reinstatement Agreement only resolved his union grievance, and the Reinstatement Agreement is ambiguous as it fails to define or clarify the words "charges," "claims," and "complaints." [Filing No. 78 at 21-22.] He further argues that the case that FCA cites in support is unavailing. [Filing No. 78 at 22.]

In reply, FCA reiterates its arguments and notes that although Mr. Cox did not have legal counsel, he was still represented by his union. [Filing No. 82 at 7.] It also asserts that the list of "charges, claims, and/or complaints" is unambiguous and expansive enough to cover legal claims. [Filing No. 81 at 7-8.] Further, it argues that the first sentence of the Reinstatement Agreement, which states, "you were properly discharged," means that Mr. Cox cannot now claim that he was not properly discharged. [Filing No. 81 at 8.]

A plaintiff may waive a Title VII claim via a contract that is entered into knowingly and voluntarily.[5] *Alexander v. Gardner–Denver Company*, 415 U.S. 36, 52 (1974); *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714-17 (7th Cir. 2009). A release affecting a federal right must be knowing and voluntary under federal law. *Alexander*, 415 U.S. at 52; *Hampton*, 561 F.3d at 714-17. When the party challenging the release "come[s] forward with specific evidence sufficient to raise a question as to the validity of the release," the Court will examine the "totality of circumstances" surrounding the agreement, including, but not limited to:

(1) the employee's education and business experience;

(2) the employee's input in negotiating the terms of the settlement;

(3) the clarity of the agreement;

(4) the amount of time the employee had for deliberation before signing the release;

(5) whether the employee actually read the release and considered its terms before signing it;

(6) whether the employee was represented by counsel or consulted with an attorney;

(7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and

(8) whether the employee's release was induced by improper conduct on the defendant's part.

---

[5] When a waiver of federal rights is challenged, the Court is often asked to construe the scope of the contract under state law before addressing whether it was entered into knowingly and voluntarily in compliance with the federal standard for waiving federal rights. *See Hampton*, 561 F.3d at 714-17 (first addressing scope of an agreement that purported to release Title VII claims under state contract law before addressing validity under federal law). Here, the parties focus solely on whether Mr. Cox knowingly and voluntarily waived his claims under the "totality of circumstances" test and do not argue about scope except for arguing about whether the "clarity" factor in the knowing and voluntary totality of circumstances assessment is met. [*See* Filing No. 56 at 25-26; Filing No. 78 at 21-22; Filing No. 81 at 7-8.] Because the parties do not challenge the scope of the Reinstatement Agreement independently of its clarity under the totality of circumstances test, the Court assumes that scope under state law is not an issue and proceeds directly to validity under federal law.

*Hampton*, 561 F.3d at 716-17 (citation omitted).  Although the plaintiff must "produce specific evidence of factors that vitiated his consent to the release," the ultimate burden of showing knowing and voluntary consent is on the employer.  *Pierce v. Atchison Topeka & Santa Fe Ry. Co. (Pierce II)*, 110 F.3d 431, 438 (7th Cir. 1997); *see also Hampton*, 561 F.3d at 716.

Here, Mr. Cox notes the following circumstances that led him to believe that he was not releasing his Title VII claims:[6] he did not have an attorney; the grievance process followed the collective bargaining agreement between FCA and his union, which only resolves contractual issues; no one mentioned the release of legal claims in discussions regarding the Reinstatement Agreement; and the lack of clarity in the language of paragraph 1., which states, "You agree that all grievances, charges, claims, and/or complaints that were filed or that could have been filed that concern your termination of employment are resolved."  [Filing No. 55-2 at 26.]  The Court finds that these circumstances are sufficient to reach the issue of whether Mr. Cox entered into the Reinstatement Agreement knowingly and voluntarily.  *See Hampton*, 561 F.3d at 716 (plaintiff's showing that: her lawyer did not review a release agreement before she signed it; neither the union or company explained the release to her; and she was not allowed to take a copy of it home was sufficient for the court to reach the issue of whether she entered the agreement knowingly and voluntarily).

Applying the factors listed above to Mr. Cox's circumstances, the Court concludes that he did not knowingly and voluntarily waive his Title VII claims regarding his termination.  To start, the language of the Reinstatement Agreement, specifically paragraph 1., lacks clarity.  Notably

---

[6] It does not appear that the parties truly explored this issue in discovery, perhaps because FCA never indicated that it would raise the Reinstatement Agreement as a defense to Mr. Cox's claims before summary judgment, something that Mr. Cox did not appear disturbed by.  Nevertheless, the Court does its best with the evidence presented to it by the parties regarding this issue.

missing from the paragraph—and the Reinstatement Agreement as a whole—is any language signaling its application to legal proceedings or the release or waiver of legal claims. The Reinstatement Agreement instead ambiguously states that grievances and claims are "resolved." This language lacks clarity and is a far cry from FCA's own case in support of its argument where the language of the agreement stated that the plaintiff agreed "not to appeal or grieve any of this discipline any further in any forum," which at least indicates the agreement transcends the company's internal processes by using the words "any forum." *Mundy*, 2022 WL 2068585, at *3. Moreover, Mr. Cox did not have counsel, and no one mentioned the release of legal claims in discussions regarding the Reinstatement Agreement. Based on these circumstances and the lack of evidence showing otherwise, the Court finds that Mr. Cox did not validly waive his Title VII claims. Since Mr. Cox's Title VII claims for discrimination and retaliation are not barred by the Reinstatement Agreement, the Court turns to the merits of each claim.

### c.   Merits of Discrimination Claim

FCA argues that Mr. Cox's race discrimination claim fails because he does not present sufficient evidence that would permit a reasonable fact finder to conclude that his race caused his termination as required under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), or present enough evidence under the *McDonnell Douglas* framework. [Filing No. 56 at 26-30.] Specifically, FCA argues that Mr. Cox cannot establish a prima facie case under *McDonnell Douglas* and even if he could, he fails to establish that Mr. Smith or Ms. Sanders did not honestly believe that he was sleeping on the job. [Filing No. 56 at 29-30.] It argues that Mr. Cox's assertion that Ms. Sanders and Mr. Smith "disliked him cannot carry the day," and that he cannot establish pretext because Ms. Sanders gave him "the benefit of the doubt on every other occasion that came before her." [Filing No. 56 at 29.]

In response, Mr. Cox asserts that there is direct evidence that FCA discriminated against him on the basis of his race, as evidenced by Ms. Sanders' recognition that Mr. Smith and Mr. Freda were "bias[ed] against Mr. Cox." [Filing No. 78 at 30.] He also argues that, under the cat's paw theory of liability, Mr. Smith and Mr. Freda were duped by Mr. Andreas' false and retaliatory reports about Mr. Cox, which is direct evidence of discrimination. [Filing No. 78 at 29-30.] Mr. Cox further argues that, under the *McDonnell Douglas* framework, he does not need to establish a prima face case and that there is sufficient evidence to show that his 2021 termination for alleged sleeping was pretextual, including: FCA's changing stories and contradictions regarding who took the photo; evidence that he was not sleeping; and the perceived bias against Mr. Cox by Mr. Smith and Mr. Freda as noted by Ms. Sanders, which a jury could infer indicates racial bias. [Filing No. 78 at 30-35.]

In reply, FCA argues that the cat's paw theory of liability does not help Mr. Cox because Ms. Sanders did not rely on Mr. Andreas' false reports, and that under *McDonnell Douglas*, he does not have a valid comparator and therefore "cannot proceed to the pretext inquiry." [Filing No. 81 at 8-9.] Nevertheless, FCA asserts that even if Mr. Cox could proceed to the pretext inquiry, the record is "replete" with evidence that the reason for his termination was credible and not connected to his race. [Filing No. 81 at 9-10.] FCA reiterates that Mr. Cox fails to discredit that Ms. Sanders honestly believed that he was sleeping on the job. [Filing No. 81 at 10.]

Title VII prohibits an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). When evaluating a Title VII race discrimination claim at summary judgment, the Court evaluates the evidence "in a single pile" and asks "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other

proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters.*, Inc., 834 F.3d 760, 765-66 (7th Cir. 2016).  Although *Ortiz* sets forth the main question the Court should consider in its analysis, the burden-shifting framework from *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), "remains useful for focusing the evidence." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must usually establish a prima facie case for discrimination, but an exception arises when "the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) (citing *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023)).  In such a case, the prima facie analysis is bypassed because "issues of satisfactory performance and pretext overlap, allowing [the Court] 'to proceed directly . . . to pretext.'"[7] *Vichio*, 88 F.4th at 691 (quoting *Bragg*, 58 F.4th at 271).  "Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Vichio*, 88 F.4th at 691 (quoting *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000)).  To demonstrate pretext, Mr. Cox must identify evidence that would permit a reasonable jury to conclude that the stated reason for his termination—sleeping—is "unworthy of credence." *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023) (quoting *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020)); *see*

---

[7] FCA fails to acknowledge that pretext is the main issue here since its stated reason for Mr. Cox's termination was his inadequate performance due to sleeping on the job and instead spends several pages across both its brief in support of summary judgment and its reply arguing that Mr. Cox does not establish a prima facie case under *McDonnell Douglas*.  [*See* Filing No. 56 at 27-29; Filing No. 81 at 9-10.]  In fact, FCA argues that Mr. Cox "cannot proceed to the pretext inquiry" "[b]ecause of his failure to establish a prima facie case." [Filing No. 81 at 9.]  This, however, is not the law. *See Vichio*, 88 F.4th at 691 (explaining that the prima facie analysis is bypassed when the employer raises the employee's performance as the reason for the adverse action).  The Court appropriately focuses on pretext.

also *Graham v. Artic Zone Iceplex, LLC,* 930 F.3d 926, 929 (7th Cir. 2019) (no pretext if the reason given was "honestly believed").

Under *McDonnell Douglas*, Mr. Cox has indeed identified evidence that would permit a reasonable jury to conclude that the stated reason for his termination is not credible or honestly believed, including that: Mr. Smith (his accuser) and Mr. Freda having a documented "bias" against him, which a jury could infer meant a racial bias since they did not help him and instead laughed at him when he was subjected to from multiple racial slurs at work, *see Booker v. Johnsonville, LLC*, 713 F. App'x 506, 507 (7th Cir. 2018) (noting that "boy" when used to refer to a Black person is a racial slur and derogatory); Mr. Smith previously submitting two reports to Labor Relations that Mr. Cox was harassing Mr. Hawkins which turned out to be false, as substantiated by both Mr. Hawkins himself and Ms. Sanders; Ms. Sanders' statement that he would be in "deep shit" the next time he was called into Labor Relations; the inconsistencies regarding the photograph purporting to show Mr. Cox sleeping at work, which does not show Mr. Cox's eyes, has a Christmas tree in it despite it being April when supposedly taken, and shows Mr. Cox in athletic shoes, not his work boots, meaning that he was done with work at the time of the photograph; the lack of a straight story as to who took the photograph; and the presence of a corroborating witness who said that Mr. Cox was not sleeping at the time Mr. Smith accused him of sleeping. Further, both Mr. Cox and Mr. Smith complained that FCA was ignoring/not properly handling employee complaints. [Filing No. 55-7 at 19-20; Filing No. 70-5.] This evidence would permit a reasonable jury to conclude that the stated reason for Mr. Cox's termination is unworthy of credence and is instead pretext for racial discrimination.

Moreover, when analyzing the evidence in "a single pile" and evaluating it "as a whole" under *Ortiz*, the evidence would permit a reasonable factfinder to infer that Mr. Cox's race caused

his termination. *Ortiz, 834 F.3d 760, 766*. The evidence in the record suggests that Mr. Cox's termination for sleeping on the job was a subterfuge for discrimination and that up until that point, his supervisors and the Labor Relations employees tried to paint him as the bad guy to force him out the door.

FCA's argument that Mr. Cox is just asserting that Mr. Smith and Ms. Sanders did not like him is an overreaching mischaracterization of evidence, not to mention an impermissible inference in its favor. Mr. Cox has presented evidence that goes beyond Mr. Smith and Ms. Sanders not liking him, and instead calls into question the authenticity of their reason for termination and could suggest discrimination. Further, FCA's characterization that Ms. Sanders was not on a campaign to terminate Mr. Cox because she gave him the "benefit of doubt on every occasion before the 2021 termination" is disingenuous. Ms. Sanders cannot be said to have given Mr. Cox the benefit of the doubt that he was not harassing Mr. Hawkins when Mr. Hawkins himself told Ms. Sanders that Mr. Cox was not harassing him and that there was no issue. Lastly, FCA's argument that Mr. Cox failed to refute that the reason for his termination was honestly believed ignores the evidence regarding the contradictions in and the inconsistencies with the photograph, Mr. Smith's "bias" and previously false reports to Ms. Sanders, and a witness who says he was with Mr. Cox and that Mr. Cox was not sleeping on the job.

FCA's Motion for Summary Judgment, [55], is **DENIED** as to Mr. Cox's race discrimination claim.[8] The Court's finding comes with a caveat that, in the end, a jury might not credit Mr. Cox's evidence and could accept FCA's explanations and version of the relevant events. But given the above evidence and the disputes regarding material facts, a trial is necessary.

---

[8] Since Mr. Cox has presented sufficient evidence to allow a reasonable jury to infer discrimination under both *McDonnell Douglas* and *Ortiz*, the Court need not consider Mr. Cox's additional argument that the cat's paw theory of liability supports his claim.

d.  Merits of Retaliation Claim

FCA argues that Mr. Cox's retaliation claim fails because his May 2019 complaint regarding Mr. Andreas' use of "boy" is not "close enough in time to allow for an inference of causation" and that the approximately two-year gap is actually "'counter-evidence' of a causal connection." [Filing No. 56 at 33-34.]  In support, FCA cites *Filipovic v. K&R Exp. Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999), for the proposition that even a four-month lapse between a complaint and an adverse action is counter-evidence of causation.  [Filing No. 56 at 34.]  FCA also asserts that "[a]t worst, [Mr.] Cox and [Mr.] Smith had a personality conflict," which does not violate Title VII.  [Filing No. 56 at 34.]

In response, Mr. Cox argues that, based on the evidence, "a reasonable jury could readily find that FCA terminated [him] because of his complaints of discrimination." [Filing No. 78 at 35-36.]  He argues that the evidence shows that FCA "began a campaign of harassment" against him after his complaints and began to closely surveil him, which is "relevant evidence of retaliatory intent." [Filling No. 78 at 35 (citation omitted).]  He further asserts that other employees who did not complain of discrimination have been caught sleeping on the job yet were not fired.  [Filing No. 78 at 35.]

In reply, FCA reiterates that Mr. Cox fails to establish the requisite causation needed between his complaint in May 2019 and his termination in 2021 and argues that Mr. Cox fails to provide any admissible evidence that Mr. Sanders was aware of the other sleeping employees when she handled Mr. Cox's termination.  [Filing No. 81 at 14.]  It also argues that Mr. Cox fails to support his claim of surveillance with admissible evidence.  [Filing No. 81 at 15.]

In addition to discrimination, Title VII prohibits an employer from retaliating against an employee "on account of [the] employee's having opposed, complained of, or sought remedies for,

unlawful workplace discrimination."  42 U.S.C. § 2000e-3(a); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013).  To prevail on a Title VII retaliation claim, the plaintiff must produce evidence that would allow a reasonable jury to conclude that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  *Brooks v. City of Pekin*, 95 F.4th 533, 540 (7th Cir. 2024); *Chatman v. Board of Ed. of City of Chicago*, 5 F.4th 738, 748 (7th Cir. 2021).

Showing a causal link requires showing that adverse action was taken because of the protected activity.  *Brooks*, 95 F.4th at 540.  In extreme cases, the timing of events can, by itself, be sufficient evidence of causation.  *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (holding that adverse impact occurring "the very day after" the protected activity was one of the rare cases where suspicious timing alone was enough to create a triable issue); *cf., e.g., Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (holding that a four-month gap between plaintiff's complaint and adverse action, without more, was insufficient to establish a causal connection); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (holding that a three-month gap, without more, could not reasonably support a causal connection).

Here, Mr. Cox has made the requisite showing to prevail on his retaliation claim.  FCA only disputes causation and the amount of evidence Mr. Cox has presented.  It concedes that "[Mr.] Cox's termination for sleeping on the job is the sole adverse action at issue," and for protected activity, it focuses on Mr. Cox's formal complaint in May 2019 of Mr. Andreas' racial slurs and

Mr. Smith's and Mr. Freda's lack of help in remedying the harassment.[9] [Filing No. 56 at 34; Filing No. 81 at 14.]

FCA's causation argument is unavailing because it again ignores other evidence and takes impermissible inferences in its favor.  If timing were all that Mr. Cox had to support his retaliation claim, his claim would fail because the gap between his May 2019 complaint and his 2021 termination, without more, is too long to establish a causal connection.  *See Tomanovich*, 457 F.3d at 665; *Sauzek*, 202 F.3d at 919.  But timing is not all the evidence that Mr. Cox has presented. Mr. Cox has presented other evidence in support of his retaliation claim that calls into question Mr. Smith's and Ms. Sanders' motivations for his 2021 termination and supports a causal link, including: the "bias" that Mr. Smith was perceived to have had against Mr. Cox; the false reports that Mr. Smith made in December 2020 and February 2021 that Mr. Cox was harassing Mr. Hawkins; Ms. Sanders' statement that he would be in "deep shit" the next time he was called into Labor Relations; Mr. Freda's request in March 2021—the month prior to Mr. Smith's accusation that Mr. Cox was sleeping on the job—that Mr. Cox be removed from the metallurgical lab department; Mr. Freda's and Mr. Smith's "constant monitoring" of Mr. Cox leading up to his termination, which is relevant evidence of retaliatory intent, *see Walker v. City of Markham*, 676 F. Supp. 3d 623, 634 (N.D. Ill. June 9, 2023) ("surveillance 'may well be relevant evidence of retaliatory intent behind a more concrete adverse action'") (citation omitted); and the inconsistencies regarding the photograph of Mr. Cox sleeping as explained above.

---

[9] FCA also argues that other events are not "adverse actions" for which Mr. Cox can sustain a retaliation claim.  [Filing No. 56 at 34-35.]  But because Mr. Cox conceded that the adverse action anchoring his retaliation claim is his 2021 termination for sleeping on the job, the Court focuses only on that.

Moreover, Mr. Cox lodged other complaints about discrimination and harassment that FCA conveniently ignores. The Seventh Circuit has held that an informal complaint of unlawful workplace discrimination still constitutes protected activity for purposes of a retaliation claim. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) (quoting *Casna*, 574 F.3d at 427). Yet FCA ignores Mr. Cox's other complaints about discrimination, including: his first report in July 2018 to Mr. Freda regarding Mr. Andreas' racial slurs, [Filing No. 71-9 at 20]; his report in February 2019 of Mr. Andreas' continued use of racial slurs and retaliatory workload assignment, [Filing No. 69-34]; and his September 2020 report against Ms. Sanders, [Filing No. 71-9 at 51-52]. FCA's ignorance of Mr. Cox's other complaints is strategic, for it narrows the evidence and makes it seem like causation is particularly weak. But the lens of evidence in the record is wider and shows several complaints about discrimination followed by increased surveillance, false reports of harassing a co-worker, and termination based on conflicting evidence. Such evidence could lead a reasonable jury to conclude that but-for Mr. Cox's complaints of discrimination and harassment against Mr. Smith, Mr. Freda, and Ms. Sanders, he would not have been treated as he was and ultimately terminated.

Further, FCA's argument that Mr. Cox does not produce any admissible evidence with regard to his claim of "surveillance," [Filing No. 81 at 15], is inaccurate as it ignores Mr. Cox's own testimony and declaration of the intense monitoring that he experienced after his complaints, [*see* Filing No. 71-9 at 59; Filing No. 74-1 at 2]. The Court can credit such evidence, even though it is "self-serving," unless "the usual requirements for evidence at the summary judgment stage [are] not met." *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 175 (7th Cir. 2011) (holding that the district court's rejection of plaintiff's testimony about her version of events because plaintiff offered "no evidence other than her own testimony to support her argument" was in error when the

usual requirements for evidence at summary judgment were met, and that the plaintiff's self-serving deposition testimony created a factual dispute); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("We begin by noting that the district court discredited Hill's testimony about his interactions with coworkers because of its 'self-serving' nature.  This was error.  Deposition testimony, affidavits, responses to interrogatories, and other written statements are by their nature are self-serving.  As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (internal citations omitted).  Here, there is no issue regarding whether the usual requirements for evidence are met, so the Court credits Mr. Cox's testimony and declaration evidence that he was being closely monitored as a part of the evidence supporting his claim.

FCA's Motion for Summary Judgment, [55], is **DENIED** as to Mr. Cox's retaliation claim.  Mr. Cox's performance and behavior as an employee may have prompted his 2021 termination, but, in light of the evidence above, so may have FCA's intolerance of his multiple complaints about discrimination and retaliation.  A fact finder must determine whether FCA initiated Mr. Cox's termination because he had complained of discrimination and retaliation, or because his performance and behavior were inadequate.

### III.
#### CONCLUSION

By all accounts, Mr. Cox's recent employment history with FCA was turbulent, but in the end, a reasonable jury could rightly accept his version of events and find that he was discriminated and retaliated against due to his race.  Accordingly, summary judgment is not appropriate on Mr. Cox's claims.

For the foregoing reasons, the Court:

- **GRANTS IN PART** Mr. Cox's Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [84], to the extent it addresses FCA's objections to his evidence;

- **OVERRULES** FCA's conclusory and underdeveloped objections, [81], to evidence upon which Mr. Cox relies;

- **DENIES IN PART** Mr. Cox's Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [84], to the extent it argues that FCA raised new legal arguments in its reply and attaches new evidence in support;

- **DENIES** FCA's Motion for Summary Judgment, [55].

No partial final judgment shall issue.  The Court requests that the Magistrate Judge confer with the parties as soon as practicable to address the possibility of resolving Mr. Cox's claims prior to trial.

Date: 4/1/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record**

Magistrate Judge Dinsmore